STATLER HILTON HOTEL CORPORA-
TION et al., Appellants,

v.

WELLS FARGO ARMORED SERVICE
CORPORATION, Appellee.

No. 8632.

District of Columbia Court of Appeals.

Argued Feb. 18, 1975.

Decided March 15, 1977.

Hugh E. Donovan, Rockeville, Md., for appellants.

Gary W. Brown, with whom Russell S. Bernhard, Washington, D.C., was on the brief, for appellee.

Before KELLY and NEBEKER, Associate Judges, and REILLY, Chief Judge, Retired.

REILLY, Chief Judge, Retired:

This is an appeal from a judgment in favor of the defendant in an action brought by the Statler Hilton Hotel and Zurich Insurance Company to recover damages incurred when an agent of the defendant was held up and robbed of a locked suitcase containing approximately $16,333.00 in cash belonging to the hotel.[1] The complaint stated two alternative causes of action: (1) negligence on the part of the bailee, and (2) breach of a contract of insurance.

The trial court directed a verdict for the defendant on the negligence issue after appellants had rested their case, and on the contract issue after all the evidence was presented. Appellants contend that the court erred in both instances.

The record shows that, pursuant to a contract with the appellant hotel corporation, Wells Fargo, a company in the business of providing delivery service for the transportation of money, checks, and securities, and insuring their customers against incidental risk, provided a uniformed armed guard one day a week to the downtown Statler Hilton Hotel. The contract did not specify his duties, but under the direction of the hotel management, his routine was to report at approximately 11 a. m. each weekly pay day to the cashier's office on the fourth floor of the hotel. There, he was handed a locked satchel filled with enough currency to cash the checks issued to the employees on the hotel payroll and carried it by elevator to a basement office, accompanied by the particular cashier (a woman) detailed to perform the check-cashing service. When they arrived in the basement, he unlocked the door to the cashing office and turned over the satchel and keys to her. He then stood guard for an interval of one or two hours outside the office as the checks were being cashed, before retrieving the satchel and escorting the cashier to the upper office. This routine was repeated in the afternoon for the benefit of the second shift.

At the trial, appellants called Charles E. Lewis, a guard who had been employed in this assignment for about a year before the robbery. He testified that on March 2, 1972, he picked up the satchel and with a Mrs. Mabel Lunn from the cashier's office, who was carrying a heavy change machine filled with coins, proceeded to a service elevator on the fourth floor in order to descend to the basement. As they opened the doors to the vestibule beside the elevator shaft, they encountered two men dressed in the garb of hotel maintenance employees. Before the guard could press the elevator button, the strangers drew pistols, pointed them at his head, and seized the satchel. One of them snatched the guard's weapon and forced him to use his handcuffs to lock himself and the cashier to a stairway railing while they made their escape.

The guard's account of the holdup was corroborated by that of Mrs. Lunn, also produced as a witness by the plaintiff. After calling two other hotel employees to the stand and putting certain discovery material and the Wells Fargo contract into evi-

---

1. The insurance company reimbursed the hotel for part of its loss under an indemnity policy containing a $10,000 deductibility clause, and is suing as subrogee. The stolen money was never recovered and at the time this case was heard, the robbers had not been apprehended.

dence, appellants rested. Opposing counsel moved for a directed verdict, which the court granted on the negligence count, but denied on the issue of the coverage of the insurance clause in the contract. In making the latter ruling, the court observed that because the matter "could conceivably involve ambiguity" the parties would be permitted to offer additional testimony.

The contract itself, a one-page printed form (with the schedule of services and the requisite payments typed in) prepared by Armored Car Services, Inc.,[2] identified on the face of the document as "First Party", was executed on September 14, 1970, by its general manager and an official of the Statler Hilton, as "Second Party." Insofar as relevant, the contract contained these provisions:

1. First party agrees to call for sealed shipments of moneys, checks, and/or securities, to receipt therefore, and to deliver same in like condition to a designated consignee.

2. The foregoing shall be performed according to the following schedule and during regular business hours, except that, if a designated day or date falls on a Sunday or a bank holiday, or in the event of some other irregularity, performance shall be as mutually agreed upon.

\* \* \* \* \* \*

A. Call at Riggs National Bank for change fund and deliver to Second Party by 1:00 p. m. daily.

B. Collect bank deposit from Second Party and deliver to Riggs National Bank.

C. Call at Riggs National Bank each Thursday morning for payroll funds and deliver to Second Party by 10:30 a. m.

D. Provide Guard Service every Thursday from 11:30 a. m. to 1:40 p. m. and 3:30 to 4:30 p. m.

3. First Party agrees to provide insurance in the amount of $120,000.00 Dollars for the benefit of itself and shipper covering any shipment coming within the terms of this contract against all risk of loss or damage while said property is in the care and custody of the First Party.

\* \* \* \* \* \*

5. For all of the above services Second party agrees to pay First party as follows:

Pick up and delivery—$95.00 per month.

Payroll guard service—$30.00 per pay day.

\* \* \* \* \* \*

At the trial and in this court, Wells Fargo contended that its obligation to insure (¶ 3, *supra*) covered only A, B, and C, of the schedule—not D. To support this thesis, it called Raymond L. Crocker, the general manager who had signed the contract. Crocker testified that prior to submitting the draft contract to the insured, he received a telephone call from N. H. Kreutzky, the hotel comptroller, requesting his company to provide somewhat the same services it had furnished several years before (1958–1963) to the hotel—pickup and deliveries of deposits and currency to and from the Riggs bank and the hotel daily, and a payroll delivery on Thursdays. He said that Kreutzky also asked for one additional item of service—providing a security guard who would stand by while the hotel employees' checks were being cashed. He later submitted a contract proposal covering a schedule in accordance with his notes of these instructions and was subsequently informed that the proposed contract had been signed and was to become effective October 1, 1970.

Crocker also testified that until the robbery he had never been informed that the duties of the guard he provided included

2. This corporation was subsequently acquired by Wells Fargo, defendant below and appellee in this court.

the transfer of money from one area of the hotel to another, as he assumed the check-cashing was to be done at the fourth floor office. He said that the insurance clause was never intended to apply to the intrahotel guard service, but that he had not mentioned this to Kreutzky in their telephone conversation.

The defense then rested. Kreutzky took the stand as a rebuttal witness and testified that he would not have signed the contract had he been aware that the insurance did not cover the protection of the payroll in the basement, but admitted that the specific functions to be covered by the insurance provisions were not discussed. At this point, appellants rested and moved for a directed verdict in their favor on the contract issue on the ground that the written instrument was not ambiguous. Opposing counsel agreed that the contract did "speak for itself" and moved for a directed verdict for Wells Fargo. After hearing arguments, the court informed the jury that transportation within the confines of the hotel was not within the scope of ¶ 3 of the contract (the insurance clause) and it was therefore directing a verdict for Wells Fargo.

■ We discern no error in the trial court's construction of the contract, for the crucial provision regarding the obligation to provide insurance is limited to "covering any shipment coming within the terms of this contract" (¶ 3). While the term "shipment", standing alone, might be read as including the transportation of the cash satchel from one floor of the hotel to the basement, the term here is qualified by the wording of the first paragraph of the contract agreeing to call for "sealed shipments of moneys . . . to *receipt* therefore, and to deliver same in like condition to a *designated consignee.*" (Emphasis added.) The guard service performed here did not call for receipting—the guard was never informed or furnished an inventory of the contents of the satchel—or delivery to a designated consignee. All that he was required to do was to take the satchel from one of the cashiers on the fourth floor,

escort her to the basement office, and then return it to the same person. Consequently, an interpretation of the contract as insuring only such "shipments" as were made between the hotel and the designated bank was not erroneous.

Appellants argue—overlooking the fact that they urged the court to rule as a matter of law that the text of the contract entitled them to a directed verdict—that because the court first pronounced the instrument ambiguous and entertained parol evidence, it should have let the issue of contract construction go to the jury. Even though this argument was not foreclosed by their position at the trial, we perceive no merit to it. The parol evidence received threw no additional light upon the intention of the contracting parties. Although each of them thought it meant something different from what his opposite number assumed, neither discussed his understanding of the text with the other. Nor did the practice of the parties under the contract—a matter sometimes taken as indicative of their real intent—shed any light on the issue, as the actual duties of the payroll guard once he reported to the hotel were never brought to the attention of the other signatory.

■ It is well settled in this jurisdiction that a trial judge is permitted to change his mind on the meaning of a written contract, if his "change of opinion resulted from a reconsideration of the written agreement itself, and not from a reappraisal of the parol evidence offered in aid of interpretation." *Coles v. Redskin Realty Co.,* D.C. Mun.App., 184 A.2d 923, 925 (1962). *See also Soldano v. Holmes,* D.C.Mun.App., 60 A.2d 535 (1948). This, the record discloses, is the case here.

We are also not persuaded that the trial court erred in directing a verdict against appellants on the question of negligence. Appellants, citing *Banachowski v. Saunders,* D.C.App., 187 A.2d 891 (1963), and *Star Pontiac Company, Inc. v. Eastern Insurance Company,* D.C.Mun.App., 184 A.2d 200 (1962), for the proposition that proof of

delivery of the goods to the bailee and their subsequent loss, presents a prima facie case of negligence on the part of the bailee, argue that the evidence they presented was sufficient to warrant consideration by the jury.

Had the only evidence received in the instant case at the time the plaintiffs rested consisted of the delivery of the locked case of money to the guard and his failure to return it intact to the cashier, we would be compelled under those authorities to reverse any directed verdict ordered at that stage of the trial. Such evidence would have been sufficient to raise a presumption of negligence, thereby placing on defendant the burden of going forward by introducing testimony rebutting any inference of carelessness or misconduct on the part of the bailee. And even then, unless such testimony incontrovertibly established that the loss had occurred because of circumstances beyond the control of a prudent bailee, a question of fact would have been presented which only a jury could decide.

■ But the transcript of this trial discloses that the rule referred to by those authorities has no application here, for it was the testimony given by the plaintiffs' witnesses which not only explained how the loss occurred but demonstrated that even with the exercise of reasonable care, the guard could not have averted the robbery. There was some suggestion in the record— the court permitted the guard to be cross-examined as if he were an adverse witness—that if the guard had not been wearing a sweater over his holster belt he could have drawn his gun. But as he—as well as the hotel cashier—was already covered by the pistols brandished by the two robbers when he became aware that he was ambushed, such an attempt would have been reckless.[3] In the briefs and oral argument, appellants point to nothing in the record which indicates negligence on the guard's part.

The rules regarding presumptions in tort cases, like the principle of *res ipsa loquitur*, are not to be applied woodenly. In our opinion, the record before us reveal that plaintiffs' own case was such that no countervailing testimony by the opposing party was called for. *See Evans v. Byers*, D.C. App., 331 A.2d 138, 141 (1975).

*Affirmed.*

---

**3.** The guard's version of the incident was corroborated in all relevant details by plaintiffs' own employee—the cashier.