913 P.2d 377 (1996)
128 Wash.2d 931
Certification from the United States District Court for the Eastern District of Washington In Kevin M. GARDNER and Teri E. Gardner, husband and wife, Plaintiffs,
v.
LOOMIS ARMORED INC., a foreign corporation, Defendant.
No. 63060-7.
Supreme Court of Washington, En Banc.
April 4, 1996.
*378 Perkins, Coie, Thomas F. Kingen, Spokane, Wallace, Brennan & Folan, Patrick J. Folan, Torrance, CA, for Defendant Loomis Armored, Inc.
Paul J. Burns, Spokane, WA, for Plaintiffs Kevin and Teri Gardner.
DOLLIVER, Justice.
The United States District Court for the Eastern District of Washington asks whether an employer contravenes public policy when it terminates an at-will employee who violated a company rule in order to go to the assistance of a citizen who was in danger of serious physical injury or death. We answer in the affirmative.
Plaintiff, Kevin M. Gardner, worked for Defendant, Loomis Armored Inc. (Loomis), as a guard and driver of an armored car. On March 10, 1994, Gardner and his partner, Steffon Sobosky, made a scheduled stop at a Seafirst Bank branch in Spokane. Sobosky got out of the truck and entered the bank while Gardner stayed in the driver's compartment.
Gardner then saw a woman, whom he recognized as the bank manager, run out of the bank while pointing behind her and screaming. Gardner looked behind the manager and saw a man with a knife chasing her. The armed man (hereinafter referred to as the suspect) was approximately fifteen feet behind the manager. While running past the front of the truck, the manager looked straight at Gardner and cried out, "Help me, help me." Deposition of Kevin M. Gardner at 203 (Oct. 20, 1994). Gardner described the expression on her face:

*379 It was more than fear. There was a real it was like a horrified kind of a look, like youI can't describe it other than that, I mean sheshe was horrified, not just afraid.
Deposition of K. Gardner at 203. Gardner looked around the parking lot and saw nobody coming to help the manager. After the manager and the suspect ran past the front of the truck, Gardner got out, locking the door behind him. As he got out of the truck, he temporarily lost sight of the manager and the suspect, who were both on the passenger side of the truck. While out of Gardner's view, the manager reached a drive-in teller booth across the parking lot, where she found refuge. It is unclear whether the manager was safe before Gardner left the truck, but by the time Gardner walked forward to a point where he could see the suspect, the suspect had already grabbed another woman who was walking into the bank. Gardner recognized the second woman as Kathy Martin, an employee of Plant World, who watered plants at the bank. The suspect put the knife to Ms. Martin's throat and dragged her back into the bank. Gardner followed them into the bank where he observed his partner, Sobosky, with his gun drawn and aimed at the suspect. When Sobosky distracted the suspect, Gardner and a bank customer tackled the suspect and disarmed him. The police arrived immediately thereafter and took custody of the suspect. Ms. Martin was unharmed.
Loomis has a "fundamental" company rule forbidding armored truck drivers from leaving the truck unattended. The employee handbook states, "[v]iolations of this rule will be grounds for termination." Employee Handbook at 10. Drivers may not exit the compartment under any circumstance. This rule is for the safety of both the driver and the partner who enters the businesses to make pickups or deliveries. The rule is so absolute, the driver is not allowed to get out of the truck when pulled over by someone who appears to be a police officer. Instead, the driver must show the officer a card which explains the driver will follow the officer to the police station. Employee Handbook at 11. When emergencies arise, the driver, although confined to the compartment, can summon help or take other action using the two-way radio, public address system, and sirens.
Gardner was fired for violating this work rule by exiting the truck during the March 10, 1994, incident. Gardner's partner was not disciplined in any way for his involvement with the hostage situation. Gardner sued Loomis in the United States District Court for the Eastern District of Washington, making multiple claims, one being wrongful discharge in violation of public policy. Judge Quackenbush certified the following question to this court:
Does it violate public policy in the State of Washington to discharge an at-will employee for violating a company rule in order to go to the assistance of a citizen held hostage at the scene of a crime, and/or who is in danger of serious physical injury and/or death?
Under the common law, at-will employees could quit or be fired for any reason. Roberts v. Atlantic Richfield Co., 88 Wash.2d 887, 891, 568 P.2d 764 (1977). In recent years, courts have created certain exceptions to the terminable-at-will doctrine. One of these exceptions says employees may not be discharged for reasons that contravene public policy. Almost every state has recognized this public policy exception. 1 Henry H. Perritt, Jr., Employee Dismissal Law and Practice §§ 1.13-1.63 (3d ed. 1992 & Supp. 1995) (giving an exhaustive state-by-state survey of wrongful discharge actions). These public policy tort actions have generally been allowed in four different situations: (1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing. Dicomes v. State, 113 Wash.2d 612, 618, 782 P.2d 1002 (1989).
This court first allowed a wrongful discharge claim on public policy grounds in Thompson v. St. Regis Paper Co., 102 *380 Wash.2d 219, 685 P.2d 1081 (1984). Thompson involved a situation where a divisional controller had instituted an accurate accounting program required by the Foreign Corrupt Practices Act of 1977, Pub.L. No. 95-213, 91 Stat. 1494. The employee claimed he was terminated in retaliation for complying with the law, and his discharge was intended to serve as a warning to other divisional controllers. The court ruled a plaintiff could satisfy the elements of a wrongful discharge claim by showing the discharge may have contravened a clearly stated public policy. Thompson, 102 Wash.2d at 232, 685 P.2d 1081. Once a plaintiff shows the violation of a public policy, the burden shifts to the employer to prove the dismissal was for reasons other than those alleged by the employee. Thompson, 102 Wash.2d at 233, 685 P.2d 1081. See also Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wash.2d 46, 70, 821 P.2d 18 (1991) ("[E]mployer must articulate a legitimate nonpretextual nonretaliatory reason for the discharge.").
In creating a public policy tort action, Thompson cautioned the exception should be narrowly construed in order to guard against frivolous lawsuits:
In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.

Thompson, 102 Wash.2d at 232, 685 P.2d 1081 (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625 (1982)). Determining what qualifies as a clear mandate of public policy is a question of law. Dicomes, 113 Wash.2d at 617, 782 P.2d 1002.
Most of the public policy cases argued in front of this court since Thompson have fallen under the third and fourth categories described in Dicomes v. State, 113 Wash.2d 612, 782 P.2d 1002. The most recent cases fit into the third category, where employees are fired in retaliation for asserting a legal right. Washington courts have found at least three different legal rights of employees with which employers cannot interfere. See Bravo v. Dolsen Cos., 125 Wash.2d 745, 888 P.2d 147 (1995) (nonunion employees terminated for exercising their statutory right to engage in concerted action); Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wash.2d 46, 821 P.2d 18 (1991) (employees terminated for filing workers' compensation claims); see also Hayes v. Trulock, 51 Wash.App. 795, 755 P.2d 830 (acknowledging the trial court's finding, not challenged on appeal, that employees were fired in retaliation for complaining to officials about the employer's refusal to pay overtime), review denied, 111 Wash.2d 1015 (1988).
This court has also considered several cases falling under the fourth category, where workers are fired in retaliation for whistleblowing on illegal or wrongful employer conduct. See Farnam v. CRISTA Ministries, 116 Wash.2d 659, 807 P.2d 830 (1991) (nurse unsuccessfully claimed retaliatory wrongful discharge when fired for complaining to the media about the nursing home's legal practice of removing food tubes from terminally ill patients); Bennett v. Hardy, 113 Wash.2d 912, 784 P.2d 1258 (1990) (allowing a claim of action, analogized to whistleblowing, where sixty-year-old employee was fired in retaliation for hiring an attorney to protect her from age discriminatory practices); Dicomes v. State, 113 Wash.2d 612, 782 P.2d 1002 (1989) (state employee unsuccessfully claimed wrongful retaliatory discharge where the employee publicly disclosed the existence of surplus funds not accounted for in the department's budget).
Of the two categories of public policy tort cases discussed above, most of the successful cases in this state have presented one-sided situations where no legitimate employer interest was offered to counterbalance the stated public policy furthered by the employee's conduct. The situation presented by this case does not fit neatly into either of the categories of cases previously considered by this court. Gardner was not fired in retaliation for asserting any legal rights, nor has the employer been accused of engaging in any illegal conduct. Both parties in this case *381 have offered legitimate and valid reasons in defense of their actions. To obtain a proper resolution of this case, this court must decide whether several public policies have been successfully invoked by Plaintiffs. Additionally, we must determine whether Defendant has offered legitimate interests in enforcing the work rule which Gardner violated. Prior cases have not demanded such a delicate balancing of interests as is required for a proper resolution in this case. The parties' arguments must be analyzed.
Plaintiffs argue that Gardner's going to the aid of a woman in a hostage situation furthered public policies embodied in common law and an assortment of statutes. Plaintiffs first point to statutes concerning citizens' interaction with law enforcement. One statute gives citizens who aid police officers the same civil and criminal immunity as such officers. RCW 9.01.055. Another statute cited by Plaintiffs makes it a crime to obstruct law enforcement officers from carrying out their duties. RCW 9A.76.020. A third cited statute makes it a crime for a citizen to refuse unreasonably an officer's request to summon aid for the officer. RCW 9A.76.030. Finally, the Crime Victims, Survivors, and Witnesses Act explicitly says victims, survivors of victims, and witnesses of crimes have a civic and moral duty to cooperate fully and voluntarily with law enforcement and prosecutorial agencies. RCW 7.69.010. Plaintiffs argue Gardner fits within the Act's definition of a crime witness. These statutes allegedly express a clear public policy encouraging citizens to assist law enforcement in the effective apprehension and prosecution of criminals. Plaintiffs argue Gardner's termination for leaving the truck in order to respond to a hostage situation contravened this public policy.
Plaintiffs also argue Gardner's termination violates the public policy which encourages citizens to come to the aid of others in need of care. In support of this public policy argument, Plaintiffs point to the rescue doctrine, RCW 4.24.300, and language in State v. Hillman, 66 Wash.App. 770, 832 P.2d 1369, review denied, 120 Wash.2d 1011, 841 P.2d 47 (1992).
The rescue doctrine arises in the context of tort claims. The doctrine "is intended to provide a source of recovery to one who is injured while reasonably undertaking the rescue of a person who has negligently placed himself in a position of imminent peril." Maltman v. Sauer, 84 Wash.2d 975, 976-77, 530 P.2d 254 (1975). Plaintiffs' Reply Brief quotes language from a case which states:
The rescue doctrine encourages efforts to save imperiled persons despite a rescuer's voluntary (though not reckless) exposure to danger.
Ballou v. Nelson, 67 Wash.App. 67, 70, 834 P.2d 97 (1992). Plaintiffs argue that Gardner's involvement with the hostage situation furthered the public policy evinced by the rescue doctrine.
Plaintiffs cite RCW 4.24.300, which encourages persons to render emergency care to those in need by releasing rescuers from liability should injuries result from negligent acts committed in the course of rendering emergency care or transportation. Language from Hillman is also cited in Plaintiffs' Reply Brief to support their assertion of there being a public policy encouraging citizens to come to the aid of those in need. In Hillman, the trial court exceeded the sentencing guidelines when imposing a murder sentence on the defendant. The Washington State Court of Appeals upheld the exceptional sentence because the victim was a good samaritan who had stopped to help the defendant with a broken down car on the roadside:
Although murder itself offends fundamental notions of morality, to murder a person who comes to one's aid discourages others from offering aid to persons in need of help. The ramifications to a civilized society are indeed disturbing.
Hillman, 66 Wash.App. at 776, 832 P.2d 1369.
This case also presents a public policy of encouraging citizens to save others from life threatening situations. Plaintiffs did not focus on this third public policy as distinct from the good samaritan doctrine, but the certified question clearly raises the distinct issue. This third policy narrowly focuses on *382 situations where a citizen's life is in imminent danger, whereas the good samaritan doctrine encompasses a broad range of conduct where one renders any kind of aid to someone in need of help.
Loomis argues it did not fire Gardner in retaliation for his saving a hostageit fired him solely because he left the truck in violation of the work rule. This claim is supported by the fact that Loomis did not discipline Gardner's partner, who was just as involved with the situation as Gardner. Gardner argues Loomis must take into account his reasons for leaving the truck when choosing the punishment for breaking the rule, but Loomis implies it would terminate an employee for violating the work rule regardless of what kind of excuse the employee offered. Gardner has offered no evidence questioning the sincerity of Loomis' position.
Because this situation does not involve the common retaliatory discharge scenario, it demands a more refined analysis than has been conducted in previous cases. Loomis' seemingly legitimate work rule has come into conflict with employee behavior that may have socially redeemable aspects. This court must decide whether any of the three public policies put forth by Plaintiffs were violated when Defendant discharged Gardner, and whether the alleged violation of the public policies warrants recovery.
Henry Perritt Jr., one of this country's foremost scholars on labor and employment law, advocates a comprehensive test for analyzing wrongful discharge claims involving violations of public policy. Perritt proposes four elements of a public policy tort case:
(1) The plaintiffs must prove the existence of a clear public policy (the clarity element). Henry H. Perritt Jr., Workplace Torts: Rights and Liabilities § 3.7 (1991) (hereinafter Perritt).
(2) The plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy (the jeopardy element). Perritt § 3.14.
(3) The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the causation element). Perritt § 3.19.
(4) The defendant must not be able to offer an overriding justification for the dismissal (the absence of justification element). Perritt § 3.21. See also Collins v. Rizkana, 73 Ohio St.3d 65, 69-70, 652 N.E.2d 653 (1995) (adopting Perritt's four element test).
Perritt's test serves as an excellent guide for analyzing all public policy wrongful discharge torts, and our adoption of this test does not change the existing common law in this state. Common law already contains the clarity and jeopardy elements. See Dicomes v. State, 113 Wash.2d 612, 617, 782 P.2d 1002 (1989) ("[T]he employee has the burden to show that the discharge contravened a clear mandate of public policy."). Whereas prior decisions have lumped the clarity and jeopardy elements together, a more consistent analysis will be obtained by first asking if any public policy exists whatsoever, and then asking whether, on the facts of each particular case, the employee's discharge contravenes or jeopardizes that public policy. The jeopardy element guarantees an employer's personnel management decisions will not be challenged unless a public policy is genuinely threatened. The causation element is also firmly established in Washington common law. See Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wash.2d 46, 68-69, 821 P.2d 18 (1991). Finally, the overriding justification element enables this court to weigh properly Loomis' argument, which claims Loomis' workplace rule should trump any public policies furthered by Gardner's actions. Each of the public policies raised by Plaintiffs must be scrutinized under this four-part test.
First, Plaintiffs propose a public policy encouraging citizens to help law enforcement, and they point to several statutes as support for their proposal. RCW 9.01.055 grants citizens limited civil and criminal immunity when helping a police officer, but the statute does not apply unless the officer requested such assistance, or the officer was in imminent danger of death or serious injury. RCW 9A.76.030 makes it a misdemeanor to refuse an officer's request to summon aid. RCW 9A.76.020 prohibits the obstruction of law enforcement efforts. The Crime Victims, *383 Survivors, and Witnesses Act, RCW Chapter 7.69, urges citizens to help in the prosecution of criminals, and sets forth certain rights of citizens involved with the prosecution.
The four statutes, RCW 9.01.055, 9A.76.020, 9A.76.030, and 7.69.010, do encourage citizens to come to the aid of law enforcement but only under very limited circumstances. It would be more accurate to say the statutes support a public policy encouraging citizens to cooperate with law enforcement when requested or clearly required by law. See, e.g., RCW 9.69.100 (requiring witnesses of violent crimes to report the crime to officials). Public policy is not furthered by encouraging citizens to jump into the midst of every criminal situation. Citizens have not had law enforcement training, and their involvement in many situations can create additional risks of harm to those involved. A limited, albeit clear, public policy can be found in the cited statutes, but Plaintiffs give an overexpansive reading of those statutes in their attempt to present a general policy encouraging citizens to help in law enforcement. Plaintiffs have not satisfied the clarity element with respect to their first offered public policy.
Since the "helping law enforcement" policy as argued by Plaintiffs fails to meet the clarity element, it is unnecessary to discuss further the alleged policy with regards to the other elements.
Plaintiffs argue Gardner's conduct implicates a second public policy, which is the policy of encouraging citizens to render aid to those in need, or be good samaritans. This policy can allegedly be inferred from the rescue doctrine, RCW 4.24.300, and language in State v. Hillman, 66 Wash.App. 770, 832 P.2d 1369, review denied, 120 Wash.2d 1011, 841 P.2d 47 (1992).
A general policy of helping those in need cannot be found in the rescue doctrine. The rescue doctrine allows a rescuer to recover damages from the rescued person when the rescuer was injured in the course of the rescue. However, the doctrine applies only if the rescued person negligently caused the dangerous situation that invited the rescue. Maltman v. Sauer, 84 Wash.2d 975, 976, 530 P.2d 254 (1975). This doctrine is not squarely based on a public policy of encouraging citizens to help those in needif such were the case, the doctrine would allow injured rescuers to recover from the rescued person regardless of whether the perilous situation was negligently caused by the rescued person.
Although the rescue doctrine does not demonstrate a public policy encouraging good samaritans, RCW 4.24.300 and Hillman weakly demonstrate that society places some value on citizens who help others in need. RCW 4.24.300 releases emergency caregivers from liability when the victim is negligently injured by the caregiver in the course of rendering emergency transportation or care. This statute may have been designed by the Legislature in response to the concern that the threat of litigation would otherwise discourage citizens from offering emergency aid to others. The statute shows a clear public policy valuing a very limited class of good samaritans who render emergency care or transportation. Hillman praises a broader range of good samaritan acts when it gave a defendant an exceptional sentence for killing a good samaritan motorist who had stopped to help the defendant with a broken down car. See previous discussion herein. The broad good samaritan policy offered by Plaintiffs finds weak support in legislative and judicial materials. For purposes of the remaining discussion, we will assume that Plaintiffs have proven the existence of such a broad good samaritan public policy. Ultimately, however, our decision does not rest on whether such a policy actually exists.
The certified question presents a third public policy when it points out that Gardner went "to the assistance of a citizen held hostage ... and/or who is in danger of serious physical injury and/or death." Society places the highest priority on the protection of human life. This fundamental public policy is clearly evidenced by countless statutes and judicial decisions.
The value placed on human life is demonstrated by the fact that courts have even suspended certain fundamental constitutional rights when a citizen's life is in imminent danger. For example, the Fourth Amendment's *384 protection against warrantless searches is waived under limited exigent circumstances, including situations where the search is necessary "to prevent physical harm to the officers or other persons." United States v. Gooch, 6 F.3d 673, 679 (9th Cir.1993) (quoting United States v. McConney, 728 F.2d 1195, 1199 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)); see also State v. Loewen, 97 Wash.2d 562, 568, 647 P.2d 489 (1982) (medical emergency may justify warrantless search of suspect's belongings).
Besides subordinating some constitutional rights, the public policy favoring the protection of human life also serves as a defense against most criminal charges. See generally RCW Chapter 9A.16. What would otherwise be the illegal use of force becomes lawful when it is done to protect oneself or others from injury. RCW 9A.16.020(3); see State v. Penn, 89 Wash.2d 63, 568 P.2d 797 (1977). Homicide is justifiable if committed in the lawful defense of oneself or others. RCW 9A.16.050; see State v. Griffith, 91 Wash.2d 572, 575, 589 P.2d 799 (1979). Furthermore, in a prosecution for any crime other than homicide, it is a complete defense that "[t]he actor participated in the crime under compulsion by another who by threat or use of force created an apprehension in the mind of the actor that in case of refusal he or another would be liable to immediate death or immediate grievous bodily injury." (Italics ours.) RCW 9A.16.060(1)(a); see State v. Turner, 42 Wash.App. 242, 711 P.2d 353 (1985), review denied, 105 Wash.2d 1009 (1986). These statutes show society would rather have one commit a crime under duress than refuse compliance and risk the life of whoever is threatened. Society benefits by a citizen's death being prevented, to the extent that some constitutional rights and criminal laws are suspended when one acts to save another's life. This public policy of saving persons from life threatening situations satisfies the clarity element.
Since Plaintiffs have pointed out two public policies which were supported in varying degrees by legislative and judicial materials, the next three elements of Perritt's test will be applied to those policies. Under the second element, the employee's discharge must jeopardize the public policy. To establish jeopardy, plaintiffs must show they engaged in particular conduct, and the conduct directly relates to the public policy, or was necessary for the effective enforcement of the public policy. Perritt § 3.14 at 75-76. This burden requires a plaintiff to "argue that other means for promoting the policy ... are inadequate." Perritt § 3.14 at 77. Additionally, the plaintiff must show how the threat of dismissal will discourage others from engaging in the desirable conduct.
Gardner's responding to the hostage situation directly served both the good samaritan policy and the policy of saving lives. He was under no obligation to get involved, yet he acted as a good samaritan by voluntarily risking his own life and aiding a helpless victim of crime. By leaving the truck, following the suspect into the bank and disarming the suspect of his knife, Gardner unquestionably rescued the hostage from imminent life threatening harm. Furthermore, the facts of the situation tend to show Gardner reasonably believed the woman's life was in immediate danger, and he was the only source of help. Cf. State v. Penn, 89 Wash.2d 63, 66, 568 P.2d 797 (1977) (adopting the American Law Institute's Model Penal Code § 3.05(1) (Adopted 1962), "Use of Force for the Protection of Other Persons," which allows such force, in part, when "the actor believes that his intervention is necessary for the protection of such other person."). As Gardner testified in his deposition, when he saw the manager being chased by the suspect, he looked around the parking lot and saw no one else "in a position to help." Deposition of K. Gardner at 208. In recognizing the woman as the bank manager, he could reasonably believe that the scenario was not a ploy designed to get him out of the truck there was a genuine threat to the manager's life. Once he got out of the truck, Ms. Martin, whom Gardner also recognized, had already been taken hostage, and there were still no police or other persons available to help the woman. A jury could easily find Gardner believed his conduct was necessary to rescue Ms. Martin from an imminent life threatening situation.
*385 Gardner's being fired for those actions will discourage similar future conduct in other employees. If employers are allowed to terminate their employees for saving persons from life threatening situations when the employee appears to be the only hope of rescue, then the policy encouraging all citizens to engage in such conduct would be jeopardized. See Perritt § 3.14 at 77.
Defendant argues that, regardless of what public policies may have been served by Gardner's involvement with the hostage situation, the causation element is not satisfied. Gardner was not discharged for getting involved with the hostage situation; rather, the termination was solely because Gardner violated a fundamental work rule forbidding drivers from leaving their trucks. In support of this distinction, Defendant points out Gardner's partner was not disciplined in any way for his involvement in the situation because his presence in the bank was consistent with his duties.
Defendant's argument lacks merit. Gardner broke the work rule expressly in order to save a person being chased by a man with a knife. Gardner saw the bank manager pursued by the suspect and decided to exit the truck. After he got out of the truck a different woman already had been taken hostage by the suspect. Gardner's leaving the truck cannot be analyzed in isolation: his initial act of getting out of the truck is inextricably intertwined with his motive for leaving it and his subsequent actions.
The flaw in Defendant's argument can be demonstrated by the following example. If the truck were on fire, Gardner would have to leave the truck to save his life. If Defendant fired Gardner for leaving the burning truck, public policy would clearly be violated. Gardner's reasons for exiting the truck must be taken into account when determining whether his discharge was because of the public-policy-linked conduct. Plaintiffs have satisfied the causation element.
The last element inquires whether the employer has an overriding reason for terminating the employee despite the employee's public-policy-linked conduct. This fourth element of a public policy tort acknowledges that some public policies, even if clearly mandated, are not strong enough to warrant interfering with employers' personnel management.
Loomis has exhaustively defended its work rule as an overriding justification. The rule is allegedly necessary to protect the safety and lives of Loomis employees. The drivers are safe inside the compartments and they can use the available two-way radio, public address system, and sirens to summon help. A driver's exiting the truck severs the partner's lifeline to safety and renders both employees more vulnerable to harm. In oral argument before Judge Quackenbush of the United States District Court for the Eastern District of Washington, Defendant cited a 1991 incident where an armored car driver got out of the truck in response to his partner being robbed. Upon exiting the truck the driver was shot six times and killed.
A more specific reason for strictly enforcing the work rule involves the risk of robbers using a ploy to get the driver out of the truck. Such resourcefulness amongst thieves is not uncommon when large amounts of money are involved. See, e.g., Statler Hilton Hotel Corp. v. Wells Fargo Armored Serv. Corp., 370 A.2d 1358 (D.C.1977) (guard robbed in elevator by suspects dressed as hotel maintenance employees); Schwegmann Bros. Giant Super Markets v. Underwriters at Lloyd's, London, 300 So.2d 865 (La.Ct. App.1974) (phony armored guard driving what appeared to be a company truck successfully picked up the store's daily receipts and escaped fifteen minutes before the real truck arrived). The risk of thieves resorting to trickery is evidenced by Loomis' rule requiring drivers to follow a police officer to the police station before getting out of the truck. If robbers knew they could trick drivers out of the truck every time it appeared someone was in need of help, the occurrence of such ploys could increase.
A third reason behind Loomis' work rule may involve insurance policies. Some insurance companies will not cover a loss if the truck was robbed while left unattended. See, e.g., Save-Mor Supermarkets, Inc. v. Skelly Detective Serv., Inc., 359 Mass. 221, 268 N.E.2d 666 (1971) (insurance did not cover *386 theft of truck and its contents when the guard and driver were twenty-five feet from the truck at a snack bar, thereby failing to be "in attendance" of the truck). Loomis did not discuss its insurance policy in this case.
Loomis has defended its work rule as part of a fundamental policy designed to guarantee the safety of its employees. This court must balance the public policies raised by Plaintiff against Loomis' legitimate interest in maintaining a safe workplace and determine whether those public policies outweigh Loomis' concerns.
The broad good samaritan doctrine argued by Plaintiffs is not a policy of sufficient importance to warrant interfering with an employer's workplace and personnel management. If we followed Plaintiff's broad reading of the good samaritan doctrine, an employer's interests, however legitimate, would be subjugated to a plethora of employee excuses. A delivery person could stop to aid every motorist with car trouble, no matter how severe the consequences to the employer in terms of missed delivery deadlines. Employees could justify tardiness or absence by claiming they drove an ailing friend to the doctor's office. The good samaritan doctrine does not embody a public policy important enough to override an employer's legitimate interest in workplace rules. Holding otherwise would not protect "against frivolous lawsuits," and employers would not be able "to make personnel decisions without fear of incurring civil liability." Farnam v. CRISTA Ministries, 116 Wash.2d 659, 668, 807 P.2d 830 (1991) (quoting Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232-33, 685 P.2d 1081 (1984)).
The narrow public policy encouraging citizens to rescue persons from life threatening situations clearly evinces a fundamental societal interest of greater importance than the good samaritan doctrine. The value attached to such acts of heroism is plainly demonstrated by the fact that society has waived most criminal and tort penalties stemming from conduct necessarily committed in the course of saving a life. If our society has placed the rescue of a life above constitutional rights and above the criminal code, then such conduct clearly rises above a company's work rule. Loomis' work rule does not provide an overriding justification for firing Gardner when his conduct directly served the public policy encouraging citizens to save persons from serious bodily injury or death.
We find that Gardner's discharge for leaving the truck and saving a woman from an imminent life threatening situation violates the public policy encouraging such heroic conduct. This holding does not create an affirmative legal duty requiring citizens to intervene in dangerous life threatening situations. We simply observe that society values and encourages voluntary rescuers when a life is in danger. Additionally, our adherence to this public policy does nothing to invalidate Loomis' work rule regarding drivers' leaving the trucks. The rule's importance cannot be understated, and drivers do subject themselves to a great risk of harm by leaving the driver's compartment. Our holding merely forbids Loomis from firing Gardner when he broke the rule because he saw a woman who faced imminent life-threatening harm, and he reasonably believed his intervention was necessary to save her life. Finally, by focusing on the narrow public policy encouraging citizens to save human lives from life threatening situations, we continue to protect employers from frivolous lawsuits.
SMITH, JOHNSON, ALEXANDER, TALMADGE, JJ., and PEKELIS, J. Pro Tem., concur.
GUY, Justice, concurring.
I concur in the result reached by the majority because I believe it was a violation of public policy when the employer applied this work rule under the facts existing here in order to fire Mr. Gardner. I would not find this work rule to be in violation of public policy in a general sense. However, in this case Mr. Gardner was faced with the decision whether to break what is normally a sensible and reasonable rule for his own and his partner's safety and save a woman's life or adhere to the rule and watch a woman he knew be murdered in front of him while he sat safely in his truck with a gun in hand. It defies what I believe is true about human nature that anyone would be willing to watch *387 a person die in order to comply with a company safety rule. I believe our nature would cause any decent person, under these dire circumstances, to break the rule and save the life. Even normally good rules must have exceptions and yield to a higher good. When the company chose to enforce the rule under these facts, it failed to recognize that Mr. Gardner was acting for the higher good, as would any right-thinking person.
DURHAM, C.J., concurs.
MADSEN, Justice, dissenting.
Relying on a dubious formulation of public policy, the majority today invalidates a company work rule designed to protect the lives of men and women employed as drivers in the unique and highly dangerous occupation of operating armored cars. I dissent.
In Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232, 685 P.2d 1081 (1984), this court recognized a "cause of action in tort for wrongful discharge if the discharge of the employee contravenes a clear mandate of public policy." The Thompson court also recognized that this public policy exception to the common law terminable-at-will doctrine is a narrow one. Id. at 232, 685 P.2d 1081; see also Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wash.2d 46, 53, 821 P.2d 18 (1991). Unfortunately, the majority ignores both the requirement that a clear mandate of public policy be contravened, and the requirement that the public policy exception be a narrow exception to the terminable-at-will doctrine. Then, the majority compounds this error by an expansive search for public policy to justify invalidating an employer's definition of just cause for termination. Thompson has never been used by this court to pass judgment on a company's definition of just cause and we should not do so now.
As the majority notes, the narrow public policy exception to the terminable-at-will doctrine has been applied when an employee is discharged for: (1) refusing to commit an illegal act, e.g., price fixing; (2) performing a public duty, e.g., jury duty; (3) exercising a legal right, e.g., filing a workers' compensation claim; or (4) whistleblowing. Roe v. Quality Transportation Services, 67 Wash.App. 604, 607, 838 P.2d 128 (1992) (citing Dicomes v. State, 113 Wash.2d 612, 618, 782 P.2d 1002 (1989)). The majority also observes that most of the Washington cases demonstrating a wrongful discharge in violation of public policy have fallen under the third and fourth categories listedthat is, instances where employees were fired for exercising a legal right or for reporting an employer's misconduct.
After acknowledging this precedent, the majority ignores it and instead applies a "more refined analysis" to the present case because the majority implicitly recognizes that this court has never invoked public policy to find an employee's discharge for violating a work rule is itself a violation of public policy. Majority at 382. As the majority observes, Loomis' employee handbook states that violation of the rule forbidding a driver from leaving an armored vehicle will be grounds for termination. Employee Handbook at 10 (cited in majority at 379). Thus, the majority has applied a formerly narrow exception to the terminable-at-will doctrine to a situation where an employer provided just cause for termination and where the employment-at-will rule is inapplicable. The result of the majority's analysis is that the public policy exception to employment-at-will now applies to a fifth, completely incompatible category; that is, where this court disagrees with an employer's definition of just cause for termination, as set forth in the workplace rules.
This exercise in micromanagement by the majority is accomplished by embracing a four-part test promulgated by Henry Perritt. While I do not have serious objections to this test, I find it cumbersome and unnecessary to a determination of whether a discharge in violation of public policy has occurred. Moreover, I do not see how the Perritt test supports the majority's conclusion that Gardner's termination for leaving the Loomis truck constitutes a violation of public policy.
Perritt proposes that four elements must be satisfied before a plaintiff may prove a public policy wrongful discharge tort: (1) the existence of a clear public policy, (2) that discouraging the conduct in which he or she engaged would jeopardize the clear public *388 policy, (3) that the public-policy-linked conduct caused the dismissal, and (4) the absence of an overriding employer justification for the dismissal. See, Henry H. Perritt, Jr., Workplace Torts: Rights and Liabilities §§ 3.7-3.21 (1991) (cited in majority at 12).
According to Perritt, whether clear public policy is implicated can be resolved in four basic ways, with diminishing effectiveness:
1. By identifying a specific provision of a statute, constitution, or administrative regulation
2. By synthesizing a policy from several different statutes or constitutional provisions
3. By identifying a right or mode of conduct covered by a traditional common law cause of action
4. By identifying a trade practice.
Perritt § 3.7, at 66-67.
Initially, it is significant that most Washington cases finding a public policy violation have identified a single statute that clearly sets forth the relevant policy. See Bravo v. Dolsen Cos., 125 Wash.2d 745, 888 P.2d 147 (1995) (firing of nonunion employees for striking violated policy of RCW 49.32.020, which prohibits employers from interfering with the collective action of employees); Wilmot, 118 Wash.2d 46, 821 P.2d 18 (firing of employees for seeking workers' compensation benefits violated policy set forth in RCW 51.48.025, which prohibits employers from discharging employees who file worker compensation claims); Bennett v. Hardy, 113 Wash.2d 912, 784 P.2d 1258 (1990) (firing of 60-year-old employee for hiring an attorney to protect her from age discriminatory practices violated policy of RCW 49.44.090, which makes age discrimination an unfair labor practice); and Hayes v. Trulock, 51 Wash.App. 795, 755 P.2d 830 (firing of employee for complaining to officials about employer's refusal to pay overtime violated RCW 49.46.100), review denied, 111 Wash.2d 1015 (1988).
By contrast, none of the three policies discussed in this casehelping law enforcement, encouraging good samaritans, and protecting human lifeis embodied in any single, specific legal provision. Instead, the plaintiffs and the majority attempt to satisfy the clear public policy element of the Perritt test by synthesizing policies from a number of laws which are only tangentially related to the public policy which the majority wants to find.
The majority itself rejects the plaintiffs' efforts to find a public policy of encouraging citizens to help law enforcement. While the statutes plaintiffs cite encourage citizens to come to the aid of law enforcement, they do so "only under very limited circumstances." Majority at 383. The majority finds it more accurate to say that the statutes support a public policy encouraging citizens to cooperate with law enforcement when requested or required, and then states as follows:
Public policy is not furthered by encouraging citizens to jump into the midst of every criminal situation. Citizens have not had law enforcement training, and their involvement in many situations can create additional risks of harm to those involved. A limited, albeit clear, public policy can be found in the cited statutes, but Plaintiffs give an overexpansive reading of those statutes in their attempt to present a general policy encouraging citizens to help in law enforcement.
Majority at 383. In other words, the majority concludes that the limited statutory policy of cooperating with law enforcement does not justify this court's invalidation of the Loomis work rule. I agree.
My disagreement with the majority comes when it synthesizes two other public policiesencouraging good samaritans and protecting human lifein exactly the same manner as the plaintiff found his public policy of helping law enforcementby an overexpansive reading of case law and statutes.
The majority first explains that the good samaritan policy cannot be found in the rescue doctrine, which allows a rescuer to recover damages from the rescued person when the rescuer was injured in the course of the rescue. Maltman v. Sauer, 84 Wash.2d 975, 976, 530 P.2d 254 (1975). This doctrine applies only if the rescued person negligently caused the dangerous situation that invited the rescue. As the majority observes, this limited doctrine "is not squarely *389 based on a public policy of encouraging citizens to help those in need...." Majority at 383.
The majority finds, however, that RCW 4.24.300 and State v. Hillman, 66 Wash.App. 770, 832 P.2d 1369, review denied, 120 Wash.2d 1011, 841 P.2d 47 (1992), "weakly demonstrate that society places some value on citizens who help others in need." Majority at 16. RCW 4.24.300 releases emergency caregivers from liability when the victim is negligently injured by the caregiver in the course of rendering emergency transportation or care. Hillman upholds the exceptional sentence of a defendant who killed a good samaritan. Hillman, 66 Wash.App. at 777, 832 P.2d 1369. From this support, the majority concludes that plaintiffs have proven the existence of a broad good samaritan policy.
I find it difficult to see how affirming the exceptional sentence in Hillman is "squarely based on a public policy of encouraging citizens to help those in need...." See Majority at 383. Will citizens will be encouraged to act as good samaritans if they know that those who kill them will be punished severely? More plausibly, Hillman is aimed at punishing the wrongdoer, not at encouraging the actions of a good samaritan.
I also fail to see how a statute dealing with the release of emergency caregivers from liability establishes a clear public policy of encouraging citizens to go to the rescue of others or to act as good Samaritans. Here again, "[a] limited, albeit clear, public policy can be found" in the cited statute, but plaintiffs "give an overexpansive reading of the statutes in their attempt to present a general policy" encouraging citizens to act as good samaritans. See Majority at 383.
Assuming that the cited statutes and case law establish a broad public policy of encouraging rescues by good samaritans, I agree with the majority that this public policy is too weak to justify interfering with the Loomis work rule. However, I do not see how Hillman and RCW 4.24.300 clearly prove the existence of such a good samaritan policy, and I would conclude that this policy fails to satisfy even the first requirement of Perritt's four-part test.
Nor do I see any stronger support for the majority's second public policyprotecting human life. As evidence thereof, the majority first cites federal case law holding that the Fourth Amendment's protection against warrantless searches is waived where the search is necessary to prevent physical harm to the officers or others. The majority then turns to Washington statutes and case law, observing (1) that the illegal use of force becomes lawful when done to protect persons from injury; (2) that homicide is justifiable if committed in defense of oneself or others; and (3) that in a prosecution for any crime other than homicide, it is a defense that the actor was threatened with immediate death or serious injury. Majority at 383-84. From these legal precepts, the majority discovers a public policy of encouraging persons to save others from life-threatening situations that it says satisfies Perritt's clear public policy element.
Again, I disagree that such a clear public policy exists. To borrow from the majority's earlier criticism of the plaintiffs' proffered public policy of aiding law enforcement: the statutes and cases relied upon are "not squarely based on a public policy of encouraging citizens to help those in need." Majority at 383. Rather, a waiver of Fourth Amendment protections involves a weighing of a criminal defendant's right to privacy against the right of third parties to safety from physical harm. Likewise, statutes preserving the right of a person to act in self-defense are aimed at protecting such persons from criminal prosecutionnot at "encouraging citizens to help those in need." Id. at 383. In finding a clear public policy of saving others from harm, the majority is guilty of the same overexpansive synthesis of law for which it earlier criticized the plaintiffs.
Instead of the questionable analysis employed by the majority here, I would follow the reasoning of the Court of Appeals in another public policy termination case, Roe v. Quality Transportation Services, 67 Wash.App. 604, 838 P.2d 128 (1992). In Roe, the plaintiff argued that she was wrongfully discharged from her job for refusing to submit to a drug test. She contended that a clear *390 mandate of public policy favoring employee privacy could be found in the state constitution, statutes, and the common law tort of invasion of privacy. Roe, 67 Wash.App. at 607, 838 P.2d 128. Before analyzing these legal provisions, the Court of Appeals cited this court's earlier directive that it look to "`the letter or purpose of a constitutional, statutory, or regulatory provision or scheme' or in `[p]rior judicial decisions ...' when attempting to find and articulate a clear mandate of public policy." Id. at 607, 838 P.2d 128 (citing Thompson, 102 Wash.2d at 232, 685 P.2d 1081). The Court of Appeals then rejected the plaintiffs' contention that art. 1, § 7 of the Washington Constitution provided the needed clear mandate of public policy. While the court acknowledged that the provision creates a right of privacy, it also observed that, in Washington, this constitutional provision has been construed as a restraint on government and not as a restraint on private individuals. Roe, 67 Wash.App. at 608, 838 P.2d 128.
The court next considered whether RCW 49.44.120, which prohibits private or public employers from requiring employees to take lie detector tests, was a valid source of public policy. The Court of Appeals noted that a West Virginia court had found by analogy that public policy would prohibit drug testing by private employers, but added that West Virginia's standard for recognizing a public policy exception to the terminable-at-will doctrine is "less rigorous than the clear mandate of public policy [that Washington] courts require." Roe, 67 Wash.App. at 609, 838 P.2d 128. The Court of Appeals did not find Washington's lie detector statute a proper source of public policy. The court further found that none of the other privacy statutes plaintiff cited suggested a legislative intent to announce public policy in the area of drug testing. Plaintiff then contended that the common law tort of invasion of privacy provided the needed mandate, but the Court of Appeals concluded that the cases cited raised primarily personal interests rather than the competing interests of the private employer and the employee. Id. at 610, 838 P.2d 128.
The Court of Appeals then made a statement of particular relevance to the present case: "Thompson requires that we `find' not `create' public policy and further requires that the existence of such public policy be `clear.'" Id. at 610, 838 P.2d 128. The court held that the trial court had properly "exercis[ed] the caution that Thompson requires" and affirmed the dismissal of the case. Id. at 610, 838 P.2d 128.
The majority's approach here is closer to a creation of policy than a discovery thereof, and what it creates is scarcely clear. None of the common law or statutory provisions it cites applies squarely to the facts in this case. Loomis cites Roe in its brief and offers a criticism of plaintiffs' argument that now applies to the majority opinion:
[I]t is nonsensical to argue ... that a party may choose a statute which is not affected by the facts of the case ... strip the statute of its limiting terms and then analyze the remains to determine its broadest conceptual purpose ... and then extrapolate back to a conclusion that since the general conceptual purpose is impacted by said facts, the statute likewise is necessarily impacted.
Def.'s Opp'n Br. at 15.
The next step in the Perritt test is for the plaintiff to show public policy is jeopardized by the employer's rule. To satisfy this factor a plaintiff must show that other means for promoting the public policy are inadequate. Majority at 384 (citing Perritt § 3.14, at 77). While the majority recognizes this second element, apparently the Perritt analysis fails to support the majority's analysis, for it declines to address this required showing and instead cites a case adopting a Model Penal Code provision that allows the use of force when the actor believes such force is necessary for another's protection. State v. Penn, 89 Wash.2d 63, 66, 568 P.2d 797 (1977). The majority then analyzes Gardner's belief that another person was in danger and finds that belief reasonable.
The cite to Penn and the Model Penal Code suggests how far afield the majority is traveling to reach its result. More importantly, the majority's discussion of Gardner's subjective belief does not satisfy the showing required by the Perritt test that other means *391 for promoting the policy would be inadequate.
Those other means are set forth in the majority opinion's statement of facts. Instead of leaving the armored car when emergencies arise, the driver can summon help by using the truck's two-way radio, public address system, and sirens. Indeed, it is likely that in most instances these measures would be more effective in saving lives than would be the driver's actions in leaving an armored car. The majority's earlier criticism of people engaging in law enforcement is equally pertinent to a situation where a driver leaves the safety of an armored vehicle to confront an uncertain and dangerous situation: "Public policy is not furthered by encouraging citizens to jump into the midst of every criminal situation. Citizens have not had law enforcement training, and their involvement in many situations can create additional risks of harm to those involved." Majority at 383.
Loomis argues persuasively that its work rule promotes rather than conflicts with a policy of saving lives:
The armored car business operates in a very dangerous world, where the goal of those few citizens who necessitate the very use of armored cars is to get the people inside the car to open it up to the people outside the car. It is not hyperbole to state that, in such situations, the armored car, with its bulletproof glass, sirens and two-way radios, is as much a lifeline for the driver/guards and their custodian/partners who are out of the armored truck as it is a secure depository for valuable commodities.
Def.'s Opp'n Br. at 7.
The majority concludes summarily and rather emotionally that if employers are allowed to terminate their employees for saving persons from life-threatening situations when the employee "appears to be the only hope of rescue," then the policy encouraging "all citizens" to engage in such conduct shall be jeopardized. Majority at 385. This conclusion takes no notice of the fact that armored car companies and their drivers are relatively few in number, or that their rule forbidding a driver from leaving a truck is actually intended to save lives. I agree with Loomis that "[w]hen one looks past the limited and emotionally charged facts of the instant case, it becomes clear that Loomis' maligned work rule actually serves the interests of society, is consistent with public policy and therefore cannot be the basis of a claim for wrongful termination in violation of public policy." Def.'s Opp'n Br. at 9.
Next, the majority finds that the causation element of Perritt's test is met, rejecting Loomis' argument that this element is not satisfied because Gardner was fired for leaving the truck and not for his subsequent conduct in the hostage situation. The majority states that this argument lacks merit despite its apparent acceptance of the distinction earlier in its opinion. See Majority at 382 ("Loomis argues it did not fire Gardner in retaliation for his saving a hostageit fired him solely because he left the truck in violation of the work rule. This claim is supported by the fact that Loomis did not discipline Gardner's partner, who was just as involved with the situation as Gardner.")
This inconsistency aside, the majority proceeds to demonstrate the flaw in Loomis' causation argument with a questionable example of its own. The majority reasons that if the truck were on fire, Gardner would have to leave it to save his life. If Loomis then fired Gardner for leaving the burning truck, public policy would clearly be violated. It thus follows, according to the majority, that "Gardner's reasons for exiting the truck must be taken into account when determining whether his discharge was because of the public-policy-linked conduct." Majority at 385.
Initially, the majority's example implicates entirely different policy concernsthose relating to self-preservationand is therefore of little use in resolving this case. Furthermore, an employee's reasons for violating a work rule do little to alter the thread of causation between the violation and a subsequent termination therefor. The question which must be answered under this part of the Perritt test is whether Gardner was fired for helping another in need or because he exited the vehicle in contravention of a work *392 rule designed for employee safety. Since Loomis did not discipline Gardner's partner it is clear that Gardner was not terminated for coming to the aid of bank personnel.
The final element of the Perritt test addresses the employer's reasons for terminating the employee to determine whether those reasons justify a violation of public policy. The majority recognizes that a driver who leaves an armored car severs the partner's lifeline to safety and renders both employees more vulnerable to harm. The majority also acknowledges that the work rule is strictly enforced to lessen the risk of robbers using a ploy to get the driver out of the truck. Loomis addressed these risks in criticizing Gardner's self-preoccupation:
Plaintiffs' analysis completely fails to consider the interests and safety of Gardner's former co-employees. Is it fair to compromise their safety and security because one individual seeks to violate a work rule whenever he deems it necessary to do a good thing? In the armored transport industry a multitude of ruses are used by criminals to lure driver/guards out of their trucks thereby cutting the custodian/partner's sole lifeline.
Def.'s Opp'n Br. at 8.
Another justification of the Loomis rule mentioned by the majority concerns the difficulty of insuring armored vehicles. What insurer will cover a loss if the truck is robbed while left unattended?
After listing these justifications, the majority concludes that the good samaritan policy is not of sufficient importance to "warrant interfering with an employer's workplace and personnel management." Majority at 386. The majority concludes, however, that the "narrow public policy" encouraging citizens to rescue persons from life-threatening situations does warrant such interference. Majority at 386. The majority adds that its decision does nothing to invalidate Loomis' work rule forbidding drivers from leaving their trucks on pain of termination. "Our holding merely forbids Loomis from firing Gardner when he broke the rule...." Majority at 386.
Does the majority really believe that its decision will have no effect on Loomis' work rule? It seems obvious to me that following the majority's decision, the Loomis rule will be called into question whenever a driver leaves a truck. If a driver leaves thinking that a passerby is in mortal danger, but no such danger is present, will his actions become those of a mere good samaritan, thereby enabling Loomis to fire him? Or, will his belief that there was life-threatening danger be sufficient to waive the termination rule? Will that belief require substantiation of the supposed danger by witnesses, or will the driver's word alone be sufficient? The majority's statement that the Loomis rule will be unaffected by its decision does not withstand scrutiny.
Moreover, the majority takes no notice of the new role that its opinion will thrust upon the courts of this state. Under the guise of a claim that the public policy exception to the terminable-at-will doctrine should apply, courts will now be forced to analyze an employer's work rules to determine whether they provide proper cause for termination. This type of micromanagement of business is a complete misapplication of the public policy exception, and can hardly be the result intended by the Thompson court's acceptance of a narrow exception to the at-will rule.
There is no question that the Loomis rule forbidding Gardner from leaving the truck is based on the substantiated conclusion that a driver's departure endangers his own and/or another's life. I therefore cannot conclude that the Loomis rule violates a public policy in favor of saving lives and would uphold the enforcement of that rule in this case. Mr. Gardner's termination does not fit within the narrow parameters of a wrongful discharge in violation of public policy.