# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| RUSSELL BURKE and JULIE BURKE, and their marital community, | No. 48497-8-II |
| Appellants, | |
| v. | |
| CITY OF MONTESANO; KEN ESTES and "JANE DOE" ESTES; KRISTY POWELL and "JOHN DOE" POWELL; and ROCKY HOWARD and "JANE DOE" HOWARD, | UNPUBLISHED OPINION |
| Respondents. | |

SUTTON, J. — Russell and Julie Burke appeal the superior court's order granting the City of Montesano's (City) motion for summary judgment on their claim for wrongful discharge in violation of public policy. Because Burke has failed to establish a genuine issue of material fact that Burke's political activity was a substantial factor or a pretext in the City's decision to terminate him, we hold that the superior court properly granted the City's motion for summary judgment. We affirm.

## FACTS

### I. BURKE'S EMPLOYMENT HISTORY

In 1986, Russell Burke began working for the City's Public Works Department. In 1996, the City promoted Burke to Streets Supervisor. In 1999, Burke was promoted to Assistant Public Works Director. In 2010, the City promoted Burke to Public Works Supervisor. The City created

the Public Works Supervisor position in order to create a union alternative to the Public Works Director position. During the time Burke was Public Works Supervisor, there was no Public Works Director. As the Public Works Supervisor, Burke performed most of the duties of the Public Works Director. However, because the Public Works Supervisor position was a union position, Burke did not have the authority to discipline or fire other union employees. Burke's direct supervisor was the City Administrator, Kristy Powell.

## II. BURKE'S POLITICAL ACTIVITIES-2011

In the summer of 2011, Burke hosted a party to support mayoral candidate Doug Streeter. Powell helped organize and attended Burke's party. Streeter's opponent, Ken Estes, won the election for mayor. In December, shortly after the election, Estes brought donuts to the public works building. Estes questioned Burke about why he had hosted the party for Streeter. Estes also offered Burke a pin that said "I was one of the 70 [percent] for Mayor Estes." Clerk's Papers (CP) at 799. Burke rejected the pin because he did not vote for Estes. After this, Burke and Estes did not have any other conversations regarding politics or the 2011 mayoral election.

## III. APPOINTMENT OF PUBLIC WORKS DIRECTOR

When Estes became mayor, he decided that it was important to have a Public Works Director who had the authority to discipline and make other personnel decisions. Estes discussed the Public Works Director position with Burke, but Burke did not want to take a position that would require Burke to leave the union. Estes appointed Powell as the Interim Public Works Director. Then, the City posted the Public Works Director position and Burke applied. Burke was Estes's, Powell's, and the interview committee's first choice for Public Works Director, but Burke

2

again declined the position because it would require him to leave the union. In May 2012, Estes offered the position to the next candidate, Rocky Howard.

After Howard accepted the Public Works Director position, the City terminated the Public Works Supervisor position. Burke then became the Public Works Lead. The Public Works Lead position was similar to the former Public Works Supervisor position except that Burke now reported to the Public Works Director and did not have the authority to approve overtime or projects.

## IV. ALLEGED THEFT OF PAINT AND INVESTIGATION

After Howard's appointment to Public Works Director, Powell became aware of an unpaid paint invoice for the Public Works Department. The discovery of the unpaid invoice prompted an investigation into the potential misappropriation of paint from the Public Works Department. The City discovered that Burke ordered almost twice as much paint from 2010-2012 than he ordered from 2007-2009. The increase in ordering paint coincided with Burke opening a personal painting business. Invoices also showed that Burke continued ordering paint into September, after the City's painting season ended in early August. On February 12, 2013, Burke was placed on paid administrative leave and notified of a pending internal investigation related to allegations against him.

On March 14, 2013, Powell wrote an email regarding a conversation with Estes and the City's attorney. The email stated that "[o]ur objective is that [Burke] will no longer work here." CP at 489.

As part of its investigation, the City ordered Burke to appear for an interview with the investigator, William Curtright, on April 8, 2013 at 10:00 a.m. Burke was warned, in writing, that failure to comply with the order to appear for the interview could result in additional disciplinary action. The City rescheduled Burke's interview from April 8 to April 11. On April 3, Burke's attorney notified the City that he would be unable to appear with Burke for the scheduled interview and requested that the interview be rescheduled. Based on scheduling difficulties, the City was not able to reschedule Burke's interview. However, the City confirmed that Burke's union representative was able to attend the interview. Burke refused to attend the April 11 interview because of his attorney's unavailability.

On April 15, 2013, the City issued Burke a written notice warning that his failure to appear was insubordination and the City was considering taking additional disciplinary action. The City also notified Burke that he was obligated to appear for an interview when the interview was rescheduled. The City rescheduled Burke's interview to April 19. Burke's attorney was again unavailable and advised Burke not to attend the interview. However, on April 30, the City suspended the investigation until June 1.

## V. *LOUDERMILL* HEARING AND SUSPENSION

On May 1, the City held a *Loudermill*[1] hearing regarding discipline for Burke's earlier insubordination and failure to appear. Rather than attend the hearing, Burke submitted a written response claiming he was not insubordinate because he was acting on his attorney's advice. Based

---

[1] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

on Burke's failure to comply with a direct order and a written warning, Estes suspended Burke without pay for 21 days.

On May 24, 2013, Burke's attorney wrote to inform the City that Burke would not participate in any interview with the City regardless of when the interview was scheduled. The City replied that, as a city employee, Burke was under obligation to obey the city's direct orders. Burke was provided with a written order to appear for an interview on June 4 at 1:00 p.m. Burke was warned that "if he refuses to appear, he disobeys a direct order and is subject to discipline." CP at 114.

Burke again failed to appear for the interview on June 4, 2013. As a result, the City began scheduling a second *Loudermill* hearing to consider discipline up to and including termination. On June 10, Burke's attorney informed the City that a *Loudermill* hearing was "not likely to be a good use of anyone's time." CP at 127. Rather than attend the *Loudermill* hearing, Burke opted to rely on his prior written communications with the City.

Also on June 10, Burke's attorney informed the City that Burke was now willing to cooperate with the investigation but only on the condition that the City retain a different investigator to perform the interview. The City informed Burke:

> An employer's work related order is not negotiable. The employee's remedy for an order believed to be unlawful or in violation of a collective bargaining agreement is to obey and grieve, or if the order is disobeyed, to raise the issue through a pre-disciplinary hearing response or grievance procedure.

CP at 135.

## VI. BURKE'S DISCHARGE/TERMINATION

On June 17, 2013, Estes issued a written notice of termination for Burke. The notice stated that Burke had "continually disobeyed any order to appear or provide information" even after a written notice and 21 day suspension. CP at 140. The notice of termination also stated that the allegations under investigation were serious and Burke's repeated disobedience prevented the City from being able to conduct its investigation. And, the notice of termination concluded:

> Your refusal to obey orders has caused enormous disruption and expense to the City. Because the allegations are so serious, and your actions have both impeded the City's investigation and made it impossible to successfully complete, I find that the only appropriate penalty is discharge.

CP at 141.

Estes later testified in a deposition that Burke's failure to attend a *Loudermill* hearing on June 17 was the final action that prompted his discharge. But a *Loudermill* hearing was not held on June 17 because when the City attempted to schedule a hearing, Burke informed them he would not appear.

Burke originally filed a grievance challenging his termination. However, he later withdrew his termination grievance and his grievance regarding his 21 day suspension.

## VII. LAWSUIT AND SUMMARY JUDGMENT ORDER

On July 30, 2015, Burke filed an amended complaint alleging claims for retaliation in violation of RCW 42.17A.495, wrongful discharge in violation of public policy, breach of contract, promissory estoppel, and violation of the Washington Constitution. The City filed a motion for summary judgment to dismiss all claims. Prior to the superior court's ruling on the City's motion for summary judgment, the parties stipulated to dismiss all of Burke's claims except for the claim

for wrongful discharge in violation of public policy. Then, the superior court granted the City's motion for summary judgment and dismissed Burke's claim for wrongful discharge in violation of public policy. Burke appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

We review the superior court's decision to grant summary judgment de novo. *Rickman v. Premera Blue Cross*, 184 Wn.2d 300, 311, 358 P.3d 1153 (2015). We affirm an order for summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Rickman*, 184 Wn.2d at 311. We review the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Rickman*, 184 Wn.2d at 311.

### II. WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

Recently, our Supreme Court clarified that the elements for wrongful discharge in violation of public policy are to be analyzed under the framework originally established in *Thompson*[2] and *Gardner*.[3] *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 358 P.3d 1139 (2015). Traditionally, courts only recognized a claim for wrongful discharge in violation of public policy in four circumstances:

> "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing."

[2] *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984).

[3] *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 913 P.2d 377 (1996).

*Rose*, 184 Wn.2d at 276 (quoting *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 936, 913 P.2d 377 (1996)).

Here, Burke's claim, that he was discharged for exercising his First Amendment right to engage in political activities, falls under one of the four standard circumstances for wrongful discharge in violation of public policy. For this type of claim, we apply the three-step, burden shifting test under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). The first step is for the plaintiff to make out a prima facie case for wrongful discharge by showing that he exercised a constitutional right, he was terminated, and the protected activity was "a cause" of the plaintiff's termination. *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 70, 821 P.2d 18 (1991). If the plaintiff presents a prima facie case, in the second step the burden of production shifts to the employer to "articulate a legitimate nonpretextual nonretaliatory reason for the discharge." *Wilmot*, 118 Wn.2d at 70. The third step requires the plaintiff to produce sufficient evidence that the employer's alleged nonretaliatory reason for the employment action was pretextual. *Wilmot*, 118 Wn.2d at 70. An employee may satisfy the pretext prong by establishing a genuine issue of material fact that either (1) the employer's articulated reason for its action is pretextual, or (2) although the employer's stated reason is legitimate, retaliation for protected activity nevertheless was a substantial motivating factor. *Wilmot*, 118 Wn.2d at 73.

Here, assuming without deciding that Burke has met his burden to establish that political retaliation was a cause of his termination, the City has articulated a legitimate nonretaliatory reason for Burke's termination and Burke cannot meet his burden to establish pretext. Accordingly, summary judgment was proper.

Burke's notice of termination clearly states that the City's reason for his termination was insubordination. And Burke's termination came after Burke was warned, in writing, on numerous occasions that his failure to cooperate with the City's internal investigation constituted disobeying a direct order subjecting him to disciplinary action, including termination. The City gave Burke at least three opportunities to appear for interviews with the investigator. And on each occasion, the City warned Burke that he was being given a direct order to appear. The City also imposed an intermediary progressive discipline—a 21 day suspension of Burke—for the same conduct. The record establishes that the City gave Burke a direct, legal order, Burke repeatedly disobeyed that order, and the City provided him written warnings regarding additional progressive discipline for disobeying the order prior to termination. Therefore, the City has met its initial burden of production to show that Burke's termination was for reasons other than political retaliation.

Burke does not dispute any of the facts surrounding the investigation, his refusal to appear when ordered, or his termination. Nor does he appear to dispute that termination is an appropriate action for an insubordinate employee. Therefore, in order to meet his burden under the pretext prong, Burke must show that political retaliation was a substantial motivating factor in the City's decision to terminate him.

Burke points to two specific pieces of evidence to support his assertion that political retaliation was a substantial factor in Estes decision to terminate him: (1) the March 2013 email from Powell in which Powell asserts the City's objective is for Burke to no longer work for the City, and (2) the deposition testimony by Estes that the decision to terminate Burke was based in part on Burke's refusal to participate in a second *Loudermill* hearing on June 17, when a second hearing was never scheduled. Br. of App. at 28-29. Even viewed in the light most favorable to

Burke, neither piece of evidence establishes political retaliation was a substantial motivating factor in the City's otherwise legitimate decision to terminate Burke.

Viewed in the light most favorable to Burke, the March 2013 email demonstrates that the City was *interested* in terminating Burke before his insubordination. But the email does not create a reasonable inference that the City had *decided* to terminate him before his failure to appear for the June 4 interview. Further, the email was written in the context of an investigation that strongly suggested that Burke had engaged in misconduct, which had already resulted in his suspension. And Powell, not Estes, authored the email. Therefore, reading the email to establish that the City had decided to terminate Burke *because of political retaliation* is not a reasonable inference. Instead, Burke's argument is based on speculation and speculation cannot be considered on summary judgment. *Little v. Countrywood Homes, Inc.*, 132 Wn. App. 777, 780, 133 P.3d 944 (2006).

Similarly, Estes's statement that Burke's failure to attend a second *Loudermill* hearing on June 17 was part of the reason for his termination is not evidence that political retaliation was a substantial factor in Burke's termination. Burke correctly points out that (1) a *Loudermill* hearing was not ultimately scheduled in June, and (2) even if a *Loudermill* hearing had been scheduled, he would not have been required to attend. And under some circumstances, providing an inaccurate reason for a termination can provide evidence of pretext. *See Renz v. Spokane Eye Clinic, P.S.*, 114 Wn. App. 611, 623-24, 60 P. 3d 106 (2002).

But these facts do not create an inference that political animus was a substantial factor in the City's decision to terminate Burke for at least two reasons. First, the City did not rely on the failure to attend a second *Loudermill* hearing in its termination letter. Estes's deposition testimony

came long after the termination, when he was trying to recall the reasons for the termination. Second, even though Estes's testimony was inaccurate, it is not reasonable to infer from that testimony that the City terminated Burke *because of political retaliation.*

Here, the City had a legitimate reason to terminate Burke for insubordination and Burke has not met his burden to present evidence that created a genuine issue of material fact that political retaliation was a substantial motivating factor or pretext in the decision to terminate him. Accordingly, we hold that the superior court did not err by granting the City's motion for summary judgment and dismissing Burke's claim for wrongful discharge in violation of public policy. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

MAXA, A.C.J.

WORSWICK, J.