[No. 52867-0-I.   Division One.   September 13, 2004.]

KENNETH A. BORING, *Appellant*, v. ALASKA AIRLINES, INC., *Respondent.*

---

*Jon H. Rosen* (of *The Rosen Law Firm*), for appellant.

*Paula A. Barran, Allyson S. Krueger*, and *Bradley F. Tellam* (of *Barran Liebman, L.L.P.*) and *Suzanne K. Michael* (of *Michael & Alexander, P.L.L.C.*), for respondent.

KENNEDY, J. — The federal Pilot Records Improvement Act of 1996 (PRIA)—formerly known as the Airline Pilot Hiring Safety Act—requires that before allowing a job applicant to begin service as a pilot, an air carrier shall request and receive from air carriers that have previously employed the individual records pertaining to "any disciplinary action taken with respect to the individual that was not subsequently overturned" during the five-year period preceding the employment application.[1] Shortly before his job appli-

---

[1] *See* 49 U.S.C. § 44703(h)(1)(B)(ii)(II).

cation was accepted by Alaska Airlines, Inc., Mesa Air Group terminated Kenneth Boring's employment for insubordination. Boring filed a grievance with the pilots' union. Following a hearing, Mesa Air rescinded the termination and reinstated Boring's employment without loss of pay. In responding to Alaska Airlines' official inquiry under PRIA, Mesa reported that there had been no disciplinary action taken with respect to Boring that had not been overturned.

During the hiring interview process, Alaska Airlines asked Boring whether he *ever* had been suspended, terminated, or otherwise disciplined by Mesa Air, and Boring answered that he had not. When Alaska Airlines subsequently learned that Boring had in fact been disciplined and had failed to disclose this fact during the hiring process, it terminated his employment.

Boring brought this lawsuit, contending, among other things, that under PRIA Alaska Airlines had no right to require him to disclose facts pertaining to disciplinary action that had subsequently been overturned; and that Alaska wrongfully terminated his employment in violation of public policy upon learning that he had, as Boring puts it, exercised his right to privacy guaranteed by PRIA. The trial court granted Alaska Airlines' motion for summary judgment dismissing Boring's claims, and Boring appeals.

PRIA neither prohibits air carriers from requiring pilot applicants to disclose disciplinary action that subsequently was rescinded nor prohibits the firing of a pilot who falsely reports that there has been no such disciplinary action. Accordingly, we affirm.[2]

## FACTS

Appellant Kenneth Boring was hired by Mesa Air Group as a pilot in January 1997. On September 6, 2000, Captain

---

[2] Boring sued for wrongful termination of employment, defamation, and invasion of privacy. The trial court dismissed all his claims. He appeals the dismissal of the wrongful termination and defamation claims. We will discuss the defamation claim in the unpublished portion of this opinion.

Henry J. Myers, Regional Chief Pilot for Mesa Air, sus-
pended Boring without pay for insubordination, after Bor-
ing refused an additional flying assignment that same day.
After a meeting between Captain Myers, Chief Pilot
Zakaullah Khogyani, Air Line Pilots Association (ALPA)
Master Executive Council Chairman Captain Andrew
Hughes, and ALPA Representative Captain Casey Meeks,
Mesa Air terminated Boring's employment for insubordina-
tion on September 12, 2000.

Boring thereafter filed a grievance with ALPA and re-
quested a hearing to determine "whether the Company had
just cause to terminate me for insubordination." Clerk's
Papers at 80. Boring received a hearing and was reinstated
to employment status as a pilot with Mesa Air, effective
September 26, 2000. Captain Michael Ferverda, Senior Vice
President of Flight Operations at Mesa Air, later testified
that it was his intent to rescind the termination but not the
suspension without pay. Nevertheless, under the terms of
the collective bargaining agreement between Mesa Air
Group and ALPA, not only was Boring's termination elimi-
nated from his employment record, but Boring was also
reinstated to his former position without loss of pay. Boring
later stated that he was told that the entire incident had
been permanently cleared from his records and that Cap-
tain Ferverda told him that the incident was a "non-event,"
and that it was as if the incident had "never happened."
Clerk's Papers at 43, 253.

Boring had previously applied for a job with Alaska
Airlines. In November 2000, Boring received an invitation
from Alaska Airlines to interview for a pilot position. Boring
called Captain Ferverda again, wanting to make sure that
the disciplinary incident would be treated as a nonevent,
and left a message. Ferverda returned the call and spoke to
Boring's wife, Susan. Mrs. Boring later testified that
Ferverda told her that "it was as though nothing had ever
happened." Clerk's Papers at 44.

Boring updated his application with Alaska Airlines in
November 2000. He answered "no" to the question, "Have

you ever been discharged for misconduct or unsatisfactory performance or forced to resign from any position." Clerk's Papers at 91, Ex. 9. Boring also signed an addendum to the application which stated, "I affirm that all information contained in the . . . application as well as information given throughout the employment process, including the pre-employment drug test, is true and complete and that any misrepresentation or falsification shall be sufficient reason for dismissal from or refusal of employment." Clerk's Papers at 97. Boring signed a similar statement in two separate forms verifying his employment history and criminal history.

During the hiring process, Alaska Airlines Recruitment Manager Jacqueline Guilliams asked Boring during an interview whether he ever had been subjected to disciplinary action or termination by a prior employer. Boring did not disclose the Mesa Air incident.

Mesa Air responded to written inquiries from Alaska Airlines, as required by the PRIA. Mesa Air informed Alaska Airlines that Boring had not within the past five years "been the subject of any disciplinary action that was not subsequently overturned," had not "been removed from flying status for any performance or professional competency reason," and had not "failed to complete any training due to performance." Clerk's Papers at 346-47, 349-50.

Boring was offered a position at Alaska Airlines in December 2000 and began training in February 2001. Soon after Boring's training began, Alaska's Seattle Base Chief Pilot, Jerome Arbiter, heard from a former Mesa Air pilot that Boring had been either terminated or disciplined at Mesa. Arbiter then contacted Casey Meeks, Mesa Air's ALPA representative in Phoenix. Arbiter learned from Meeks that Boring had been "suspended pending a decision on termination" and that the subsequent termination was overturned, but the suspension was upheld. Clerk's Papers at 130-31.

Arbiter also contacted Captain Khogyani at Mesa Air. Arbiter later stated that Khogyani confirmed the informa-

tion given by Meeks and added that he would not "hire or rehire Mr. Boring," and that Boring's problems stemmed from personality conflicts, "failure to upgrade," and CRM (crew resource management) issues. Clerk's Papers at 130-31. Khogyani later testified that he confirmed to Arbiter that Boring had been suspended and that a termination action had been started against him, but claimed that he did not tell Arbiter that Boring had personality conflicts, CRM issues, or that he had failed to upgrade. Khogyani testified that he believed this information came from Meeks.

In February 2001, Arbiter reported what he had learned by way of e-mail to Paul Majer, Alaska's Director of Flight Operations. He later sent a copy of this same e-mail to Jacqueline Guilliams in April 2001. Guilliams testified that she confirmed Boring's disciplinary history with Mesa Air in late April 2001. Majer testified that he told Captain Kevin Finan, an executive at Alaska Airlines and Majer's boss, that Boring may not have been completely honest in interviewing with Alaska Airlines.

In mid-April 2001, Majer and Arbiter received an e-mail from Barry Rainey, an Alaska Airlines Chief Pilot who was one of Boring's trainers. Rainey stated that he had received an unsolicited telephone call from an unidentified former Mesa employee about Boring. Rainey stated that the conversation left him with a poor impression of Boring's professional reputation and attitude, and that he had been told that Boring had several "training failures" that were not documented. Rainey also stated that he believed that Boring was experiencing training difficulties at Alaska Airlines and suggested a review of Boring's status. Rainey later testified that he believed the former Mesa employee was credible, and that he sent the information to Majer and Arbiter so that it could be investigated. Majer and Arbiter later explained that they did not investigate whether Boring had experienced any training failures because they were primarily concerned with Boring's failure to disclose the prior disciplinary action at Mesa Air.

On May 4, 2001, Majer, Arbiter, Guilliams, and Mark Cassidy, Alaska Airlines' in-house counsel, met with Boring and Dave Timmons, an ALPA representative. When asked why he had not disclosed the disciplinary incident at Mesa Air when asked about discipline during Alaska's hiring process, Boring told Majer that the incident had been purged from his employment record and that he been instructed or counseled by Captain Ferverda at Mesa Air not to disclose the incident to any future employers. Boring then signed an authorization for Alaska Airlines to contact Ferverda. Majer, Guilliams, and Arbiter immediately contacted Ferverda by telephone. Majer subsequently testified that Ferverda told him that he had *not* told Boring not to disclose the discipline on a subsequent employment application.

On May 11, 2001, Majer met with Boring and handed him a letter terminating his employment at Alaska Airlines. The letter stated that Boring's explanation that the discipline incident had been "purged from the official records" was substantiated. The letter also stated that Alaska Airlines could not substantiate Boring's assertion that he had been instructed not to disclose the prior disciplinary action.[3] The letter also said that although Boring had been asked, during his job application interview, several questions specific to "ever" having been removed from flying status or missing work, Boring "did not disclose anything concerning the actions taken at Mesa." The letter also stated that Boring signed Alaska Airlines' application form, which specifically asked if the information was complete and whether Boring "knowingly withheld any information which would affect this information." Boring was informed that he was being terminated from employment for failure to disclose the prior discipline, despite multiple opportunities and the obligation to do so. Clerk's Papers at 14.

---

[3] Boring later testified that his statement that Ferverda had instructed him not to disclose the discipline was a "poor choice of words," and that Ferverda had indicated to Boring that he would not have to disclose the incident to future employers because Ferverda had said that it was as though "nothing had ever happened." Clerk's Papers at 60-62.

The official reason for the termination on Alaska Airline's separation notice was "failure to disclose background information." Clerk's Papers at 205.

## DISCUSSION

*Wrongful Termination Claim*

■ Employees in Washington are generally at will and can be discharged without reason. However, a discharge of an at-will employee is wrongful if done in violation of a clearly articulated public policy. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984).

■ In order to establish a claim for wrongful discharge in violation of a public policy, Boring must demonstrate (1) the existence of a clear public policy, (2) that discouraging the conduct in which he engaged would jeopardize the public policy, and (3) that the public-policy-linked conduct caused the dismissal. Alaska Airlines must then not be able to show an "overriding justification for the dismissal." *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996).

■ The public policy exception to the at-will doctrine of employment has been recognized by Washington courts in four situations: (1) employee fired for refusing to commit illegal act, (2) employee fired for performing public duty or obligation such as jury duty, (3) employee fired for exercising a legal right or privilege, or (4) employee fired in retaliation for reporting employer misconduct. *See, e.g.*, *Gardner*, 128 Wn.2d at 936; *Dicomes v. State*, 113 Wn.2d 612, 618, 782 P.2d 1002 (1989); *Thompson*, 102 Wn.2d at 234.

Boring claims that his discharge violated the public policy articulated by the federal PRIA of 1996, former 49 U.S.C. § 44936 (1996), current 49 U.S.C. § 44703 (2001), and he relies upon the third situation—employee fired for exercising a legal right or privilege. He points out that the PRIA requires air carriers to disclose "any disciplinary action taken with respect to the individual that was not

subsequently overturned . . . ." Former 49 U.S.C. § 44936(f)-(1)(B)(ii)(II) (current 49 U.S.C. § 44703(h)(1)(B)(ii)(II)). From this, Boring concludes that Mesa Air was *prohibited* from disclosing information regarding disciplinary action that was subsequently overturned and reasons not only that Alaska Airlines had no legal right to ask him to reveal the information, but also, once Alaska did so, that it was his right or privilege to conceal it. Boring is mistaken.

■ ■ Whether a particular statute contains a clear mandate of public policy is a question of law. *Roberts v. Dudley*, 140 Wn.2d 58, 65, 993 P.2d 901 (2000); *Gardner*, 128 Wn.2d at 937. In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. *Thompson*, 102 Wn.2d at 232. Prior judicial decisions may also establish the relevant public policy, but " '*courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.*' " *Id.* (quoting *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 380, 652 P.2d 625 (1982)).

Current 49 U.S.C. § 44703(h)(1) (prior 49 U.S.C. § 44936(f)-(1)) addresses the records of employment of pilot applicants and provides:

(h) Records of employment of pilot applicants.—

(1) In general.—Subject to paragraph (14), before allowing an individual to begin service as a pilot, an air carrier shall request and receive the following information

. . . .

(B) Air carrier and other records.—From any air carrier . . . that has employed the individual as a pilot of a civil or public aircraft at any time during the 5-year period preceding the date of the employment application of the individual, or from the trustee in bankruptcy for such air carrier or person . . .

(ii) other records pertaining to the individual's performance as a pilot that are maintained by the air carrier or person concerning ...

(I) the training, qualifications, proficiency, or professional competence of the individual ... ;

(II) any disciplinary action taken with respect to the individual that was not subsequently overturned; and

(III) any release from employment or resignation, termination, or disqualification with respect to employment.

Current 49 U.S.C. § 44703(h)(11) (former U.S.C. § 44936(f)-(11)) additionally provides:

(11) Privacy protections.—An air carrier that receives the records of an individual under paragraph (1) may use such records only to assess the qualifications of the individual in deciding whether or not to hire the individual as a pilot. The air carrier shall take such actions as may be necessary to protect the privacy of the pilot and the confidentiality of the records, including ensuring that information contained in the records is not divulged to any individual that is not directly involved in the hiring decision.

██ ██ In 1996, Congress passed the Airline Pilot Hiring and Safety Act, 49 U.S.C. § 44936. That act was renamed the Pilot Records Improvement Act (PRIA) in 1997 and is now found at 49 U.S.C. § 44703. As stated by the court in *Sky Fun 1 v. Schuttloffel*, 27 P.3d 361, 367 (Colo. 2001), the primary purpose of the act is to "promote air safety through the hiring of qualified pilots." Although the PRIA recognizes the privacy rights of pilots in the records that air carriers are required to provide to each other, nothing in the act clearly articulates a public policy that would prevent Alaska from requesting *additional* information from Boring about his discipline history with Mesa. To the contrary, when Congress amended the PRIA in 1997, the House Committee Report stated that, "while airlines would be free to request and receive other information not directly related to competency of the individual as a pilot, the Committee does not consider it to be required by the Pilot

Records Improvement Act." H.R. REP. No. 105-372, at 3, 105th Cong., 1st Sess. (1997).

Nothing in the provisions of the PRIA cited by Boring or revealed by this court's independent research indicates a public policy mandate that pilots may not be required to submit any more information to a potential employer than that required to be disclosed between air carriers. The regulations relating to the PRIA specifically outline the rights and duties of air carriers regarding disclosure, not limitations on requests from air carriers to individual pilot applicants.

The act prohibits disclosure of records "entered more than 5 years before the date of the request, unless the information concerns a revocation or suspension of an airman certificate or motor vehicle license that is in effect on the date of the request." Current 49 U.S.C. § 44703(h)(3). The act contains no similar prohibition regarding disclosure of records of disciplinary action taken against the individual that has been overturned. Thus, an air carrier is not required to provide records regarding disciplinary action that has been overturned but is not expressly prohibited from doing so.

Here, Mesa Air provided no records concerning the disciplinary action that was subsequently overturned, although both it and the union provided verbal information when expressly asked by Alaska Airlines officials about the matter. Although Boring seemingly believes that Mesa Air was forbidden from confirming the rescinded disciplinary action once Alaska Airlines asked about it, he has cited no authority for this proposition, and we have found none. Thus, we reject both Boring's contention that Mesa Air was prohibited from disclosing the information and that Alaska Airlines was prohibited from inquiring about it—either directly to Boring or to Mesa Air.

Certainly, we agree with Boring that the act contains provisions for the protection of pilot privacy. In addition to the limitations on the use and dissemination of the records by the requesting air carrier, the act provides that an air

carrier shall not furnish a requested record "without first obtaining a copy of the written consent of the individual who is the subject of the records requested . . . ." 49 U.S.C. § 44703(h)(5). Subsections (h)(9) and (h)(10) of the current act also give the individual the right to request to review the records and to submit comments to correct any inaccuracies contained in the records before a final hiring decision is made. But Boring reads the act far too broadly when he concludes that these privacy provisions not only permit him to fail to disclose to a prospective employer who expressly asks about the matter whether he ever has been subjected to disciplinary action but also permit him to affirmatively report to the contrary.

Neither the promotion of air safety through the hiring of qualified pilots nor the protection of the privacy of pilots as provided in the act is placed into jeopardy when an air carrier asks a pilot who applies for employment whether he or she has ever been suspended, terminated, or otherwise disciplined by any previous employer, regardless of whether the action was subsequently overturned, and no policy promulgated by the act permits such a pilot to lie or otherwise fail to reveal the information once it is requested. Accordingly, the trial court did not err by dismissing Boring's wrongful termination claim on summary judgment.

A majority of the panel having determined that the remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports but will be filed for public record in accord with RCW 2.06.040, it is so ordered.

GROSSE and APPELWICK, JJ., concur.

Review denied at 154 Wn.2d 1007 (2005).