IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| KASEY CAHAN, an individual, | No. 80731-5-I |
| Appellant/Cross-Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| FRANCISCAN HEALTH SYSTEM, a Washington public benefit corporation, d/b/a ST. FRANCIS HOSPITAL, | |
| Respondent/Cross-Appellant. | |

COBURN, J. — After she was terminated by St. Francis Hospital, registered nurse (RN) Kasey Cahan sued Franciscan Health System for wrongful termination in violation of public policy.[1] The trial court summarily dismissed Cahan's claim. It concluded that Cahan's termination implicated public policy but Cahan failed to raise a genuine issue of material fact as to the causation element of her claim, i.e., whether the hospital's reasons for terminating Cahan were pretextual or her allegedly public-policy-linked conduct was nonetheless a substantial motivating factor in her termination.

---

[1] In its answer to Cahan's complaint, Franciscan admitted Cahan's allegation that Franciscan "is a health care organization and a Washington public benefit corporation . . . , doing business as St. Francis Hospital." On appeal, Franciscan avers that it "is not doing business as St. Francis Hospital," and instead, the hospital "is a separate entity operating under the corporate umbrella of Franciscan Health System dba CHI Franciscan Health." Franciscan does not argue that the nature of its relationship to the Hospital is relevant to any issues on appeal and, thus, we need not resolve it.

Citations and pin cites are based on the Westlaw online version of the cited material.

We hold that Cahan fails as a matter of law to establish that her termination may have been motivated by reasons that contravene a clear mandate of public policy. Accordingly, we affirm on that basis and need not reach the issue of causation.

BACKGROUND

Facts

Before her termination in July 2018, Cahan had been employed by the hospital for 23 years—the last 15 as an RN in the perioperative services unit. According to Cahan's later declaration, perioperative services "is comprised of multiple units that manage the different phases of patient care for elective surgeries." "These include the Pre-Admission Clinic where Pre-Admission Testing ('PAT') occurs, the Same-day Admit and Discharge Unit ('SADU'), and the Post-Anesthesia Care Unit ('PACU')." "The nurses in these units interact with the patients in both the pre-surgical and post-surgical phases of their care." From mid-2014 until her termination, Cahan's supervisor in the perioperative services unit was Hannah Bennett. Bennett's supervisor throughout 2017 until the end of May 2018 was Amanda Brandon, who was later replaced by Lorie Khorsand.

It is undisputed that at all times relevant herein, hospital policy required doctors to transmit certain documentation to the perioperative services unit before their patients arrived there. It also is undisputed that some doctors were not timely transmitting that documentation, which included doctors' orders, consent forms, and history and physical (H&P) documentation. And, it is

2

undisputed that the job of tracking down missing documentation, including calling doctors, fell on nurses, and that nurses in the perioperative services unit, including Cahan, experienced frustration when patients would arrive without their documentation being available yet in the hospital's database. In her later deposition, Bennett described the situation as follows:

> I would say we had been struggling with some inefficiencies and staff frustration around having the required documentation to feel efficient at their work, and it had been an ongoing issue actually for a number of years that staff had raised concerns about the issue of inefficiency and having to stop during admission and call the doctor and kind of work stoppage-type issues.

On December 12, 2017, Cahan emailed Aileen Geerings, the hospital's Risk Manager, regarding patients arriving without doctors' orders:

> The question has come up multiple times regarding the nurse's liability for a surgical admission that comes to the SADU without orders. There are several patients that come to us for surgery that do not have orders from their doctors pre admission. Can we bring the patient back to a room if they do not have orders? Can we do vitals and have them disrobe and use surgical wipes? Is there an added level of liability if we DO check vitals, for example a blood pressure, and it is high? Who do we call at that point if we do not have orders to treat the patient? We have been calling anesthesia if we can't get a hold of the surgeon but are they the right choice? Procedure patients that are only receiving sedation do not have an anesthesiologist. Also, the CHG[2] wipes are considered a standard doctor's order. Can the patient use them without official orders? Many patients have sensitive skin and have reacted to the wipes. If the patient uses them as standard protocol and has a reaction to the CHG wipes is the admit nurse liable for the reaction if there were no written doctor's order? Can we do an IV[3] under the Anesthesia standard orders? What about the procedure patients? Again, they do not have anesthesia but often come without orders pre procedure.

---

[2] "CHG" is not defined in the record but presumably stands for "Chlorhexidine Gluconate."

[3] Intravenous drip.

> We DO try to call the doctors but many of our patients arrive at 0500 and reaching the doctor is not possible at that hour. (The doctor on call doesn't want to write orders for another doctor's non emergent surgical patients).
>
> This has been an ongoing issue and there have been too many incidents where we are being told to bring the patients back to begin their admissions BEFORE we get actual orders or an H and P or a consent.
>
> If you could provide some clarity to this issue it would be greatly appreciate[d]. There is confusion as to what we, the nurses, are allowed to do with our licensure without over stepping our bounds and would really appreciate your input.

That same day, Cahan sent the same email to Christopher Peredney, the hospital's clinical nurse specialist. Peredney responded less than an hour later:

> Thanks for the email bringing up the issues. There are a lot of questions to address so it may take me until the end of the week. I have meetings today from 1300 to 1600, so I will not be able to start working on it until tomorrow, but I will work on it and get you some answers. Here are a few excerpts from relevant policies. And once you see the policy language you will see that the practice you describe is not in line with policy.
> I am also attaching the document for community providers and the case request process for FMG[4] docs. Both require orders to schedule a case, thus should really be there prior to the patient coming in.
> More to come.

Appended to Peredney's response were excerpts from relevant hospital policies, including an excerpt that Peredney indicated meant "per policy they are supposed to have orders in 2 days before surgery."

Peredney followed up with another email the next morning writing:

> I spoke with [Bennett] and she gave me some perspective and let me know that she is aware of the issue of "Missing Orders" and is looking into it.

---

[4] "FMG" is not defined in the record but presumably stands for "Franciscan Medical Group."

As far as truly invasive interventions such as IV starts and port access I think we are all on the same page that we need to ensure that there is an order before proceeding. The anesthesia preop order set is actually embedded in the preop surgical orders. So if there are not surgical orders there are probably not anesthesia preop orders. If it is a surgical patient then there probably is a[n] anesthesia provider who could give at least a verbal order to start IV, pending the full order set. But my understanding is that this is not occurring with surgical patients but more with procedural areas.

For vitals, getting the patient changed, and even CHG wipes we are working off a protocol that would cover the nurse from "liability". It seems like a lot of the "orders not present" may be occurring with DI/IR[5] patients and I do not believe the CHG is used for them.

To address the CHG in more detail. I had initially thought that an order would be required. But after speaking with inpatient leadership a[s] well as regulator compliance and risk, we determined that operating by an established protocol/policy would be sufficient to cover the nurses from any "liability" of use. Of course we want to ask the patient if they have any known sensitivities to CHG we would not want to use it. And if they have very sensitive skin a test application may be warranted. But I would think that the number of surgical patients that do not have an order is small because having orders is part of the case scheduling process in the policies I sent yesterday.

[Bennett] let me know she is working on this issue and would appreciate notification anytime this occurs so that she can address it in real time.

Let me know if this answers your questions and please don't hesitate to let me know what I can do to help.

Geerings also responded to Cahan on December 13, 2017:

Thank you for your questions below. You should have orders to execute prior to the patient arriving to SADU. At the very least you should have an order for the procedure being performed. I strongly recommend bringing these concerns to your unit manager or if you would like you can also complete an IRIS[6] anonymously and it would go directly to [Bennett] for review. Behavioral issues with

---

[5] "DI/IR" is not defined in the record but presumably stands for "Diagnostic Imaging/Interventional Radiology."

[6] "IRIS" refers to an internal system used to record policy concerns.

5

medical staff providers such as providers not writing orders would go to me for additional review. Behavioral issues are forwarded to the medical director and vice president of medical affairs for review. We also look to see if there is a particular provider who consistently does not follow the standard. We look for trends and address them appropriately.

Is there a way to ensure that patient[s] have orders prior to coming to surgery for admission[?] What is your current practice? Do you have staff responsible for checking the documents necessary to proceed prior to the day of surgery? My recommendation is to ensure that you have orders prior to proceeding to reduce your risk for liability. Another important info that I wanted to relay is that after the admission assessment, it's the nurse responsibility to communicate . . . any abnormal findings to the surgeon. If you are not able to get a hold of the provider, please escalate the concern to your charge nurse. We do have a chain of command (communication) policy which you can follow to help resolve patient safety issues.

Let me know if you have any further questions. I will be happy to assist.

On December 13, 2017, Cahan forwarded Peredney's initial response to

Bennett and Brandon. Bennett responded as follows the same day:

Thank you for bringing your concerns forward. I know we've had discussion about these concerns recently and I'm sorry if some of your questions weren't resolved.

It sounds like there are a few separate concerns you are referring to:
- Pre-surgical patients without orders on DOS.[7]
- Pre-procedural patients without orders on DOS.
- Post-procedural patients being transferred to SADU without orders.

Did I capture that correctly?

Regarding pre-surgical patients not having orders on the day of surgery: would it be possible to track these for me? We are tracking compliance up to the day before surgery, but our current process is to include a call to me if documentation isn't obtained by 1300 day

---

[7] "DOS" is not defined in the record but presumably stands for "day of surgery."

before surgery. We can use anesthesia protocol for some basic orders and if the patient is having anesthesia, they are the right provider to call regarding abnormal vital signs. CHG wipes fall under the policy and don't require an order. They are non-invasive and can be purchased over the counter.

For pre-procedural patients, I need to know which providers do not have pre-procedural orders in. I have spoken with Jim Shreve within the past month regarding this concern and he is happy to follow up with specific providers.

For post-procedural patients, I agree the orders should be in when the patient comes to us. I will continue to work with Peggy Coltrin and Jim Shreve on this concern. I had asked staff to please IRIS patients who don't have orders in within 15 minutes of transfer to SADU or PACU. I haven't seen any IRIS's regarding this yet. I know IRIS takes extra time, but it is helpful to track issues, especially related to providers. I would be happy to receive an email as well.

An example email or IRIS would say:
"I received a liver BX patient of Dr. Chen's today from IR at 1230. There were no post-procedure orders in Epic. I called him to ask that orders be placed. The orders were not in Epic until 1300. This delayed my ability to provide care for the patient."

I understand the frustration and anxiety this causes and I want to resolve it. It would be helpful to have specific incidents to refer to hold providers accountable. It is difficult to make effective changes with blanket statements, unfortunately we need specifics. If you can help me with that part, I would be grateful.

In a subsequent response to Bennett, Cahan wrote that "[Peredney] indicated that we should not take patients at all without orders so now I am genuinely confused." She also wrote, "I personally don't feel comfortable in taking these patients any more."

On December 27, 2017, Cahan refused to admit a patient from the Interventional Radiology (IR) lab without orders. That same day, Brandon emailed Peggy Coltrin, the clinical manager of the laboratory that sent the patient, writing:

7

Mike in the cath lab just sent us a patient without MD orders and without report. . . .

When Mike called to tell SADU the patient was coming, Kasey Cahan, SADU RN told Mike that the patient must have post op orders to come to SADU. Mike then called for a transporter to deliver the patient to SADU without report and without orders. This patient has multiple illnesses. This is a patient safety issue. When [Cahan] called Mike, he told her that "it was not my patient."

Peggy, the OR[8] no longer sends patients to PACU without orders. We have managed to get this under control. We are reaching the critical point very quickly that we will no longer accept patients when they have no MD orders. Please make sure the doctors know that this is not going to continue to occur. We are also feeling a fair amount of flippancy from the Cath Lab RN's when this is occurring which also needs to stop.

About six months later, the hospital terminated Cahan. According to a discharge letter dated July 11, 2018, the hospital terminated Cahan for refusing to meet to discuss a performance improvement plan (PIP) that was issued to assist Cahan in correcting identified performance issues.

Procedure

In September 2018, Cahan sued Franciscan for wrongful termination in violation of public policy. She alleged that the hospital had retaliated against her for reporting noncompliance with the hospital's policies regarding pre-operative orders and for refusing the IR patient who had arrived without orders.

In August 2019, Franciscan moved for summary judgment, and Cahan moved for partial summary judgment. In her motion, Cahan argued that the court should determine as a matter of law that "Cahan has satisfied the public policy element of her wrongful termination claim," thus leaving only "matters of

---

[8] Operating Room.

8

causation and damages" for trial. In its motion, Franciscan argued that as a matter of law, Cahan's termination did not implicate a "clear mandate of public policy," and even if it did, Cahan could not "prove that her alleged public-policy-linked conduct was a 'significant factor' in her discharge." Instead, Franciscan asserted Cahan was fired for her refusal to meet with managers about a PIP after being warned about her " 'bullying and confrontational' " behavior.

In support of its motion, Franciscan submitted an affidavit from Bennett in which she attested, that between April and November 2017, she spoke with Cahan to discuss at least six instances in which Bennett concluded Cahan had engaged in inappropriate behavior toward Bennett or another employee. Bennett supported her affidavit with records memorializing her discussions. An April 24, 2017 counseling record described an incident where Cahan told a colleague, " 'You are just like a rat, trying to jump off the ship.' " According to the counseling record, the colleague perceived the comment as rude and offensive, and Cahan was counseled to refrain from making rude statements to colleagues. An April 26, 2017 a counseling record described an incident where Cahan was telling other staff members that a former colleague had been fired when in fact she had been laid off. In a June 20, 2017 "Written Warning," Bennett wrote to Cahan, "[T]here have been a number of incidents where your behavior did not meet behavioral standards . . . You were counseled about these incidents at the time; however, you appear to have established a pattern of continuing unacceptable behavior." The written warning described a September 2015 staff meeting in which Cahan had become "defensive, argumentative . . . and personal with

9

others in the room" and a June 2017 staff meeting in which Cahan disregarded Bennett's directive to stop after Cahan "brought up a personal issue about a co-worker who was not present, related to an HR issue." The written warning also stated, "Please be advised that continued unacceptable behavior issues, especially issues similar to those described above, will result in additional corrective action which may include your discharge from employment."

An October 25, 2017 counseling record described an incident in which Cahan had given "forceful feedback" to Bennett that a staffing issue had not been managed well. According to the counseling record, Cahan's comments were not founded, and Bennett later coached Cahan that it was unprofessional to have given the feedback to Bennett in front of the SADU team. Bennett wrote that Cahan's response was, " 'I don't operate in shadow, and I say what I think,' " and that Cahan indicated that she "didn't really care to hear [Bennett's] feedback." A November 20, 2017 counseling record described an incident where Cahan left a patient in SADU without giving a proper handoff to the evening shift staff. And another counseling record, also dated November 20, 2017, stated that during a recent staff meeting, Cahan "made undermining comments regarding not receiving education" prior to starting a new program. According to the counseling record, Bennett explained to Cahan during the meeting that she had been working to set up the relevant education but that it had not been arranged yet due to scheduling conflicts. Bennett indicated that Cahan continued to push the issue in the meeting in a confrontational tone, which Bennett described as disrespectful, abrasive, and confrontational.

According to Bennett's affidavit, on December 28, 2017 (i.e., the day after Cahan had refused to admit the patient who had arrived from the IR lab without orders) Bennett learned of an interaction between Cahan and a colleague, Marva Johnson, that left Johnson visibly upset. In an excerpt from Bennett's later deposition that was also submitted in support of Franciscan's summary judgment motion, Bennett recalled that she had been instructed by HR to investigate and to put Cahan on leave pending the investigation. Bennett testified she met with employees who had witnessed the exchange between Cahan and Johnson, and "as they were explaining what happened, [Bennett] was typing up what they said." Bennett testified she then had them review the statement to confirm it was accurate and then sign it. One employee witness's statement described Cahan's tone as "elevated and aggressive"; another described her demeanor as "rude and aggressive toward [Johnson]"; and a third described Cahan's tone as "elevated and rude." Two witness statements indicated that the interaction occurred in the presence of patients and visitors who were in the lobby at the time.

Franciscan presented evidence that after investigating, Bennett concluded that Cahan's behavior was inappropriate and issued Cahan a "Final Warning in Lieu of Suspension." In it she wrote to Cahan that the purpose of the final warning was "to convey to you the urgent need for you to correct the behavior issues referenced above" and that "further behavior issues may result in further corrective action, which would result in your discharge from employment."

Franciscan also presented evidence of two additional incidents involving

Cahan that occurred after Bennett issued the final warning in January 2018. The first occurred in May 2018. Bennett testified, that on May 18, 2018, it was brought to her attention by the charge nurse that "there had been some switching of assignment[s] happening, which then led to a delay in lunch relief starting." According to a counseling record that Bennett prepared following the incident, Cahan had switched assignments with another nurse without notifying or getting permission from the nurse in charge. Bennett testified that when she tried to ask Cahan about it, Cahan "immediately got defensive," would not allow Bennett to finish speaking, and walked away from Bennett when Bennett tried to explain why she was asking questions.

The second incident occurred on June 7, 2018. According to Bennett, she had received a call that morning that the Department of Health was in the hospital and that staff should be " 'on [their] toes.' " Bennett testified that when she explained to Cahan and another nurse some of the things they should do to prepare, Cahan "didn't respond at all." According to a report Bennett prepared that day, Cahan "never looked up to acknowledge what [Bennett] said, and continued working on the computer and looking at her phone[ and] . . . blatantly ignored what [Bennett] was saying."

Bennett declared that after the June 7, 2018 incident, she believed the next disciplinary step would be termination given that she had issued a final warning to Cahan in January 2018. Bennett emailed regional human resources (HR) director Mason Hudson indicating that she "would like to investigate and move to termination." Bennett declared that Hudson instructed her to set up a

meeting with HR and Cahan, and that on June 8, 2018, she and Cahan met with HR manager Les Soltis. Bennett declared that she learned later that HR had decided to issue a suspension and PIP to Cahan rather than terminate her.

According to an excerpt from Cahan's deposition, which Franciscan also submitted in support of its motion, on June 19, 2018, Cahan met with Hudson, Bennett, and Khorsand. At the meeting, Cahan was issued a written suspension, which confirmed that Cahan would "be issued a [PIP] designed to assist you in meeting our expectations." Cahan testified that at the June 19 meeting, Hudson told her that she would have to meet with Bennett regarding the PIP, Cahan told Hudson she would not meet without a witness, and Hudson told her that she could not have a witness. According to Bennett's deposition, several days later, after the PIP had been approved by HR, she and Stephanie Tomlin, another manager, attempted to meet with Cahan to discuss the PIP. Bennett testified that Cahan again indicated that she would not meet without a witness, and that after conferring with HR, Bennett told Cahan, " 'I just want to make sure you understand failure to meet will—could result in your discharge from employment.' " Bennett testified that Cahan responded, " 'I know that. [Soltis] already told me that,' " and then took her badge off and handed it to Bennett. Cahan testified that was her last day at the hospital, and she later received a letter from the hospital, dated July 11, 2018, indicating that it was "processing [her] discharge from employment effective immediately."

The trial court granted summary judgment in favor of Franciscan. In so doing, the court concluded that there existed clear public policies mandating that

13

"RNs must have provider orders and informed consent before they begin admin[i]stering care to patients as part of a surgery or procedure to be compliant with their licenses and fiduciary obligations." It also concluded that Cahan had raised a genuine issue of material fact as to whether her December 2017 conduct constituted whistleblowing with regard to these stated policies.

However, the trial court concluded further that Franciscan articulated "a legitimate nonpretextual nonretaliatory reason" for Cahan's termination, and Cahan "failed to meet her burden to present evidence that the firing was pretextual, or that her conduct in December 2017 was a substantial motivating factor in her termination." Accordingly, the court summarily dismissed Cahan's wrongful termination claim. Cahan moved for reconsideration, which the trial court denied. Cahan appeals. Franciscan cross-appeals arguing that the trial court "erred when it concluded that Cahan identified clear mandates of public policy applicable to her claims."

## DISCUSSION

### Standard of Review

"[S]ummary judgment is appropriate where there is 'no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012) (second alteration in original) (quoting CR 56(c)). We review summary judgment orders de novo, viewing all evidence and reasonable inferences in the light most favorable to the nonmoving party. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). And, we may affirm on any basis supported by the

record.[9]  Bavand v. OneWest Bank, 196 Wn. App. 813, 825, 385 P.3d 233 (2016).  We review questions of law, including whether Washington has established a clear mandate of public policy, de novo.  Danny v. Laidlaw Transit Servs., Inc., 165 Wn.2d 200, 207, 193 P.3d 128 (2008) (plurality opinion).

## Termination in Violation of Public Policy

Absent a contract to the contrary, employees are generally terminable "at will," i.e. for any reason.  Id.  In Thompson v. St. Regis Paper Co., our Supreme Court adopted an exception to this general rule by recognizing "a cause of action in tort for wrongful discharge if the discharge of the employee contravenes a clear mandate of public policy."  102 Wn.2d 219, 232, 685 P.2d 1081 (1984).

We construe the public policy exception narrowly to guard against frivolous lawsuits.  Gardner v. Loomis Armored Inc., 128 Wn.2d 931, 936, 913 P.2d 377 (1996).  Accordingly, claims of termination in violation of public policy have generally been limited to four scenarios:

> "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing."

Becker v. Cmty. Health Sys., Inc., 184 Wn.2d 252, 258-59, 359 P.3d 746 (2015) (quoting Gardner, 128 Wn.2d at 936).[10]  Here, both parties treat Cahan's

---

[9] For this reason, a cross-appeal was not necessary for Franciscan to raise its argument that Cahan's termination did not implicate public policy because this argument merely presents an alternative basis for affirming the trial court's summary dismissal of Cahan's claim.

[10] When the plaintiff's case "does not fit neatly within one of these scenarios," courts apply the four-factor "Perritt analysis" for guidance.  Becker,

December 2017 conduct as whistleblowing for purposes of this appeal.[11]

A plaintiff alleging termination in violation of public policy bears the initial burden to show that his or her discharge " 'may have been motivated by reasons that contravene a clear mandate of public policy.' " Martin v. Gonzaga Univ., 191 Wn.2d 712, 725, 425 P.3d 837 (2018). The plaintiff must also produce evidence "that the public-policy-linked conduct was a cause of the firing, and may do so by circumstantial evidence." Id. "If the plaintiff succeeds in presenting a prima facie case, the burden then shifts to the employer to 'articulate a legitimate nonpretextual nonretaliatory reason for the discharge.' " Id. at 725-26 (quoting Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wn.2d 46, 70, 821 P.2d 18 (1991)). "If the employer articulates such a reason, the burden shifts back to the plaintiff either to show 'that the reason is pretextual, or by showing that although the employer's stated reason is legitimate, the [public-policy-linked conduct] was

---

184 Wn.2d at 259. To satisfy his or her burden under the Perritt analysis, the plaintiff must prove (1) "the existence of a clear public policy (the *clarity* element)"; (2) "that discouraging the conduct in which they engaged would jeopardize the public policy (the *jeopardy* element)"; (3) "that the public-policy-linked conduct caused the dismissal (the *causation* element)"; and (4) that the employer cannot "offer an overriding justification for the dismissal (the *absence of justification* element)." Gardner, 128 Wn.2d at 941.

[11] Therefore, the Perritt analysis does not apply. See Martin v. Gonzaga Univ., 191 Wn.2d 712, 724, 524 P.3d 837 (2018) (holding that the Court of Appeals erred by applying the Perritt test to a whistleblowing claim). Cahan asserts that her refusal to admit the IR patient also falls within the first scenario, i.e., refusal to commit an illegal act. But Cahan does not point to any evidence that admitting or caring for that patient would have constituted an illegal act. In any case, as discussed below, Cahan does not establish that her conduct, however characterized, implicated public policy. Accordingly, whether Cahan's conduct also constituted refusal to commit an illegal act does not affect the outcome of this appeal, and thus, we need not make a determination in that regard.

nevertheless a substantial factor motivating the employer to discharge the worker.' " Id. at 726 (quoting Wilmot, 118 Wn.2d at 73).

Here, and as further discussed below, Cahan fails to meet her initial burden to establish that her termination may have been motivated by reasons that contravene a clear mandate of public policy and, thus, the trial court did not err by summarily dismissing her claim.

To determine whether a clear public policy exists, the court asks "whether the policy is demonstrated in 'a constitutional, statutory, or regulatory provision or scheme.' " Danny, 165 Wn.2d at 207-08 (internal quotation marks omitted) (quoting Thompson, 102 Wn.2d at 232). "Although judicial decisions may establish public policy, 'courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.' " Id. at 208 (internal quotation marks omitted) (quoting Thompson, 102 Wn.2d at 232).

"To qualify as a public policy for purposes of the wrongful discharge tort, a policy must be 'truly public' and sufficiently clear." Id. (quoting Sedlacek v. Hillis, 145 Wn.2d 379, 389, 36 P.3d 1014 (2001)); see also Dicomes, 113 Wn.2d at 618 (" '[P]ublic policy concerns what is right and just and what affects the citizens of the State collectively.' " (quoting Palmateer v. Int'l Harvester Co., 85 Ill. 2d 124, 130, 421 N.E.2d 876 (1981))). This is because "the tort of wrongful discharge is not designed to protect an employee's purely *private interest* in his or her continued employment; rather, the tort operates to vindicate the *public interest* in prohibiting employers from acting in a manner contrary to fundamental public

policy." Smith v. Bates Tech. Coll., 139 Wn.2d 793, 801, 991 P.2d 1135 (2000).

Cahan does not clearly articulate in her briefs on appeal what she believes the relevant public policy mandates are. But she asserts that "the Hospital's practice of permitting nurses to administer care to pre-surgical and post-surgical patients without provider orders contravenes public policy." She also asserts that "the Hospital's practice of permitting nurses to admit and administer care to patients without first obtaining informed consents contravenes public policy." Accordingly, we interpret her argument to be that her termination contravened clear public policies (1) prohibiting nurses from administering care to pre-surgical and post-surgical patients without provider orders, and (2) prohibiting nurses from admitting and administering care to patients without first obtaining informed consents.[12] For the following reasons, we disagree.

In support of the first stated policy, Cahan points to RCW 18.79.040(1)(e), which defines "registered nursing practice" to *include* "[t]he executing of medical regimen as prescribed by a licensed physician and surgeon." (Emphasis added.) She also points to WAC 246-840-705(3), which states that RNs function in "an interdependent role *when* executing a medical regimen under the direction of a . . . licensed physician and/or surgeon." (Emphasis added.) And she points to

---

[12] This interpretation is consistent with her counsel's formulation at oral argument, i.e., that the relevant public policies prohibit "administering care by nurses to patients without receiving or before receiving . . . orders from the physicians and without obtaining the informed consent of the patients." Wash. Court of Appeals oral argument, *Cahan v. Franciscan Health System*, No. 80731-5-I (Feb. 26, 2021), at 7 min., 0 sec. through 7 min., 15 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?eventID=2021021333.

RCW 18.79.260(2), which states that an RN "may, at or under the general direction of a licensed physician and surgeon . . . , administer medications, treatments, tests, and inoculations."  Finally, she points out that under RCW 18.79.120, unlicensed care is subject to discipline under the Uniform Disciplinary Act, chapter 18.130 RCW.

But none of these statutes or regulations express a clear mandate prohibiting nurses from administering care in the absence of provider orders. They do suggest that provider orders are required for nurses to administer certain types of care, including when functioning interdependently to execute a "medical regimen" under the direction of a physician or surgeon, or when administering medications, treatments, tests, and inoculations.  But they also contemplate that nurses will provide other types of care independently by employing their "specialized knowledge, judgment, and skill."  RCW 18.79.040(1); see also WAC 246-840-705(3) ("The [RN] functions in an *independent* role when utilizing the nursing process . . . to meet the complex needs of the client." (emphasis added)); RCW 18.79.040(1)(a) (including, in the definition of "registered nursing practice," "observation, assessment, diagnosis, care or counsel, and health teaching").  Cahan points out that the hospital's policy states, " 'a provider order is required to admit a patient, place a patient in Observation, discharge a patient, transfer a patient to another physician or facility or unit, and for all tests, services, therapies, and procedures.' "  But she cites no authority for the proposition that an internal hospital policy can establish a clear mandate of *public* policy.  For the foregoing reasons, we decline Cahan's

19

invitation to declare a public policy prohibiting nurses from administering care to patients without provider orders.[13]  Cf. Sedlacek, 145 Wn.2d at 389 (to balance interests of employer and employee and ensure judicial restraint, "we cannot conclude that a clear mandate of public policy exists merely because the plaintiff can point to a potential source of public policy that addresses the relevant issue").

Turning to Cahan's second assertion of public policy, i.e., a policy prohibiting nurses from administering care to patients without first obtaining informed consents, Cahan relies primarily on the informed consent doctrine.  See Stewart-Graves v. Vaughn, 162 Wn.2d 115, 122, 170 P.3d 1151 (2007) (providing that under the informed consent doctrine, "a health care provider has a fiduciary duty to disclose relevant facts about the patient's condition and the proposed course of treatment so that the patient may exercise the right to make an informed health care decision").  But the only reasonable conclusion from Cahan's December 12, 2017 email, and her later refusal to admit a patient, is that she was protesting the fact that consent documents were not being timely *transmitted* by providers before admission in accordance with hospital policy.  She points to no evidence that she was concerned about informed consents not

---

[13] Rather, the apparent purpose of the nurse licensing statutes and regulations on which Cahan relies is to protect patients from incompetent care.  See RCW 18.79.010 ("It is the purpose of the nursing care quality assurance commission to regulate the competency and quality of professional health care providers under its jurisdiction."); cf. In re Flynn, 52 Wn.2d 589, 594, 328 P.2d 150 (1958) (observing that the purpose of licensing dentists is to protect the public from incompetent and untrustworthy dentists).  And Cahan points to no evidence that she raised a concern that patients were receiving incompetent care.

being *obtained* for the relevant procedures. Indeed, even Cahan testified that sending patients back to the operating room without documentation was "kind of a hard stop that they had to have orders prior to the actual hands-on, touching surgery." In short, assuming without deciding that the doctrine of informed consent rises to the level of a clear public policy,[14] Cahan fails to point to facts from which a reasonable factfinder could conclude that her termination—even if linked to her December 2017 conduct—contravened any such policy.

Furthermore, as Cahan herself acknowledges in the retaliation context, the employee "must have been seeking to 'further the public good' " in engaging in her allegedly public-policy-linked conduct. Farnam v. CRISTA Ministries, 116 Wn.2d 659, 671, 807 P.2d 830 (1991) (quoting Dicomes, 113 Wn.2d at 620). Yet Cahan points to no evidence that she was seeking to further the public good when she reached out to Geerings and Peredney in December 2017 and later when she refused to admit the IR patient. Rather, the only reasonable conclusion from the record is that Cahan's December 2017 conduct was motivated by private or proprietary interests, namely, her frustration with doctors' failure to comply with *internal* policies regarding timely transmittal of documentation—and management's decision not to do more to correct this noncompliance. This frustration was understandable, as it is undisputed that it

---

[14] We observe that although there exists a cause of action for failure to secure informed consent, the failure to obtain informed consent is not alone sufficient to establish that cause of action: The plaintiff must also establish that "a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of [the] material fact or facts"; and that "the treatment in question proximately caused injury to the patient." RCW 7.70.050(1)(c), (d).

fell on Cahan and her colleagues to follow up with doctors for the required documentation. Nonetheless, the frustration arose out of an internal workflow matter.

Cahan disagrees and asserts that the hospital's practice of not enforcing its internal policy negatively affected the public good "by jeopardizing patient safety and care." But she fails to support this assertion with reference to relevant parts of the record. See RAP 10.3(a)(6) (requiring argument to include "references to relevant parts of the record"); cf. In re Estate of Lint, 135 Wn.2d 518, 532, 957 P.2d 755 (1998) (court will not assume obligation to "comb the record" for evidence to support counsel's arguments). Furthermore, even assuming the hospital's practice of not enforcing its internal policies affected patient safety, the fact that a practice *affected* the public good is not the same as establishing that Cahan was *seeking to further* the public good through her conduct. See Farnam, 116 Wn.2d at 671-72 ("Conduct that may be praiseworthy from a subjective standpoint or may remotely benefit the public will not support a claim for wrongful discharge." (citations omitted)).

In short, we are not persuaded by Cahan's assertion that there exists a clear mandate of public policy prohibiting nurses from administering care to patients without provider orders. And even assuming there exists a public policy prohibiting nurses from administering care without obtaining informed consent, Cahan fails to establish that her termination may have been motivated by reasons that contravened that policy. For these reasons, Cahan fails to establish a prima facie case of wrongful termination in violation of public policy. We affirm

the trial court's summary dismissal of Cahan's claim on this basis and need not reach the issue of causation.[15]

Fees on Appeal

As a final matter, Cahan requests fees on appeal pursuant to RCW 49.48.030, which authorizes an award of fees "[i]n any action in which any person is successful in recovering judgment for wages or salary owed to him or her." Because the trial court did not err by summarily dismissing Cahan's claims, Cahan was not "successful" under that statute. Accordingly, we deny Cahan's request for fees on appeal.

_____
Coburn, J.

WE CONCUR:

_____
Mann, C.J.

_____
Dwyer, J.

---

[15] We also need not reach the issue of whether the trial court erred by denying Cahan's motion for reconsideration, which was addressed only to the causation element of her claim.